UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

THOMAS M. MORAN,
    Plaintiff

VS.

MTA METRO-NORTH RAILROAD COMPANY,
PO NICHOLAS STRYPE (individual capacity),
PO DOUGLAS COHEN (individual capacity), PO LUIGI
SEIDITA (individual capacity), PO JASON NANDOO
(individual capacity), PO JOSEPH TERACCIANO
(individual capacity), and PO RICHARD DOE (Full names
and number of whom are unknown at present, and other
unidentified members of the MTA Police Department in
their individual capacities),

    Defendants
---------------------------------------X

CIVIL ACTION
NO. 1:19-CV-03079-AT

August 5, 2022

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE* AND AMENDED MEMORANDUM OF LAW DATED JULY 22, 2022 AND OBJECTIONS TO DEFENDANTS' PROPOSED FELA JURY INSTRUCTIONS [Doc. 122-3, pp. 10-11]

Although the Court properly held in *Moran v. MTA Metro North Railroad Co.*, 2012 WL 1226771 p. 5 (S.D.N.Y., March 31, 2021) that MTA police officers were Metro North's agents under the FELA if the jury finds that at the time of the alleged negligent conduct the MTA police officers were acting within the scope of their employment and in furtherance of Metro North's business objectives, the Court should allow plaintiff's Ex. 19 into evidence to avoid unnecessary appellate issues arising from a verdict.

Exhibit 19 is The Amended and Restated Service Agreement ("ARSA") between the Connecticut Department of Transportation ("CDOT"), the Metropolitan Transportation Authority ("MTA"), and Metro-North Commuter Railroad ("Metro-North") dated June 21, 1985. ARSA was disclosed to Metro North's attorney in this case on

February 11, 2022 and was identified as plaintiff's Exhibit 19 in a supplement to the Exhibit list filed on February 17, 2022. Also, at the same time, a copy of the PACER Docket Report in *MTA Metro-North Railroad Company et al. v. Buchanan Marine LP et al.*, 3:05-cv-00881 (PCD) was also disclosed. ARSA was filed by Metro North's attorney in the District of Connecticut as Exhibit 10 to Doc. 81 in support of Metro-North's Motion for Summary Judgment in the *Buchanan Marine* case in 2006 and a substantial portion of ARSA was filed in *Bush v. Metro North Commuter R.R. Co.*, 3:19-CV-01621 (JCH) as Doc. 21-3 in 2021.

In March 2021, this Court correctly held that the jury should be instructed that the MTA Police Officers were Metro North's agents under the FELA if they find that at the time of the alleged negligent conduct they were acting in within the scope of their employment and in furtherance of Metro North's business objectives. *Moran v. MTA Metro North Railroad Co.*, 2012 WL 1226771 p. 5 (S.D.N.Y. March 31, 2021).

In July of 2021, a District Court held that MTA Police were not Metro North's FELA agents in the absence of a contract between Metro North and the MTA Police Department. *Bush v. Metro North Commuter R.R. Co.*, 2021 WL 3116050 at 6-7 (D.Conn., Jul. 22, 2021) (emphasis added). The *Bush* Court concluded that ARSA was not a sufficient contract because: (1) it was entered into before the New York Legislature consolidated the LIRR Police and Metro North Police into the MTA, *Id.* at 8, n. 5; and (2) the plaintiff in *Bush* "[did] not contend that it governs the relationship between Metro North and the MTA police force." *Id.*

The plaintiff in the instant case contends that ARSA is a contract between Metro North and the MTA (including its employees), and that the *Bush* Court was incorrect.

2

The MTA police officers are employees of the MTA and ARSA is clearly a contract between the MTA and Metro North for operating the MTA's and Metro North's joint railroad operations in Grand Central Terminal ("GCT") and into Connecticut. The *Bush* Court mistakenly believed that a contract directly with the MTA police, as opposed to the MTA, was a prerequisite to finding the MTA police officers were Metro North's FELA agents. *See* N.Y. Pub. Auth. Law § 1266-h (merely authorizing a police department in the MTA and not a separate legal entity); *Mele v. Metropolitan Transportation Authority*, 2006 WL 2255080 (S.D.N.Y. Aug. 4, 2006) (employee in MTA Police Department suing MTA under the FELA). Although the *Bush* Court limited its holding to whether "an MTA police officer on CDOT property responding to a report of property damage to a Metro North company vehicle is an agent of Metro North for the purpose of the FELA", *Bush*, 2021 WL 3116050 at 3 (emphasis added), it drew an unnecessary and non-existent distinction between the MTA police department and the MTA when MTA police are simply employees of the MTA. The case before this Court does not involve an MTA police officer involved in a car accident on CDOT property, but does involve defendant MTA police officers working in GCT where they had what they describe as a police podium located in the main concourse next to the gate for the plaintiff's train, keys to open and close Metro North train doors, and frequently were involved in removing passengers from trains. Pl.'s Ex. 5, p. 12, L3-L23; see Pl.'s Ex. 4, p. 130, L12-L24; Pl.'s Ex. 5, p. 12 L4-16.

After *Bush*, Metro North filed a Motion *In Limine* [Doc. 102] to preclude any jury charge in this case that allows for the jury to conclude that MTA police officers could be Metro North's FELA agents because there was no contract between the MTA and Metro

North that encompassed police. The defendants make the same arguments in their July 22, 2022 Amended Memorandum of Law In Support of Defendant's Motions *In Limine* [Doc. 124].

Due to New York statutes, and the entwined relationship between the MTA police and Metro North, the plaintiff does not believe a contract is necessary to make the MTA police Metro North's FELA agents under the facts present in this case. *See Batista v Metropolitan Transportation Authority*, 2021 WL 2894351 at 4, 10 (S.D.N.Y. July 9, 2021) (holding that [t]he law recognizes Metro-North as an extension of the MTA with 'all the privileges, immunities, and exemptions of the MTA and concluding that the MTA is a railroad engaged in interstate commerce); N.Y. Pub. Auth. L. § 1264; 1266(1); 1266(2); 1266(3); 1266(5); 1266(h)(1) and (2) (establishing that MTA Police Officers working in the scope of their employment in GCT are working in furtherance of Metro North's operational activities as a railroad).

ARSA is a contract between the MTA, Metro-North, and CDOT for jointly operating and providing railroad commuter services in GCT and between GCT and New Haven, Connecticut (the Mainline), including the New Canaan, Waterbury, and Danbury branch lines. "The Service" consists of "all activities and functions including maintenance and operations associated with the trains scheduled in the Service Schedule...." (emphasis added). App. A (Ex. 19, p. 10 (p. 17 of 21 Doc. 81-20)). The MTA has the following contractual roles in furthering its own and Metro North's railroad operations:

- The "Service" includes [GCT] and [GCT] costs associated with the "maintenance, repair, and passenger use of Grand Central Terminal, which explicitly includes

4

the "GCT Police." App. A (Ex. 19, App. A, Sec. 3 "Service Share of GCT Net Operating Deficit" (Doc. 81-25, pp. 2-3)).

- The MTA owns all present and future Non-moveable Capital Assets [i.e GCT] located in New York and the right to put or place all rights and title to such assets in Metro-North. App. A (Ex. 19, p. 32 (Doc. 81-21, p. 18 of 20)).

- The MTA pays 47 percent of net operating deficit for Grand Central Terminal. App. A (Ex. 19, p. 16 (Doc. 81-21, p. 2 of 20));

- The MTA pays 43 percent of the Mainline Net Operating Deficit for the New Haven Line. App. A (Ex. 19, p. 16 (Doc. 81-21, p. 2 of 20));

- The MTA and Metro-North are both responsible for the decision to acquire Nonmoveable Capital Assets to be located in New York. App. A (Ex. 19, p. 21 (Doc. 81-21, p. 7 of 20)).

- The MTA and Metro-North are both permitted to award contracts, schedule the performance of and manage all projects for capital improvements and buy capital assets for railroad commuter services in both New York and Connecticut. App. A (Ex. 19, p. 22 (Doc. 81-21, p. 8 of 20)).

- The MTA pays 100% of capital costs of all Nonmoveable capital assets located in New York. App A (Ex. 19, p. 23 (Doc. 81-21, p. 9 of 20)).

- The MTA approves or disapproves budgets and can modify budgets for the commuter service. App. A (Ex. 19, p. 28-29 (Doc. 81-21, pp. 14-15 of 20)).

- "Metro North shall have responsibility for the day-to-day operation of the Service.... The Service shall be operated with the objective of providing timely, efficient clean and courteous service to the public on a continuing basis" App. A (Ex. 19, p. 11, Sec. 2.02 (Doc.81-20, p. 18 of 20));

- Any modification of the service schedule of consists must receive prior consent from the MTA; (Ex. 19, p. 12, Sec. 2.04(a));

- The MTA [and not Metro-North] has the right to terminate ARSA with CDOT. App. A (Ex. 19, p. 46, Sec. 12.04 (Doc. 81-22, p. 12 of 20)).

ARSA, as set forth above, is replete with contractual language legally binding Metro North and the MTA into a contractual relationship in furtherance of both the MTA's and Metro North's business activities operating Metro North in GCT and "<u>all activities and functions… and operations</u> <u>associated with the trains</u> scheduled in the Service Schedule." App. A (Ex. 19, p. 10 (p. 17 of 21 Doc. 81-20)) (emphasis added). Accordingly, to avoid any appellate issues if there is a jury verdict, the Court should admit Exhibit 19 into evidence.

## THE TIMING OF PLAINTIFF'S DISCLOSURE WAS SUBSTANTIALLY JUSTIFIED

The law on untimely disclosures is set forth in Federal Rules of Civil Procedure 26(a) and 37(c).

> …a party must, without awaiting a discovery request, provide to the other parties: (ii) a copy- or a description by category and location-of all documents … that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses…"

Fed. R. Civ. P. 26(a)(1)(A)(ii).

> A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission- must supplement or correct the disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

Fed. R. Civ. P. 26(e) (A) and (B).

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court on motion and after giving the opportunity to be heard: (A) may order payment of the reasonable expenses including attorneys' fees caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i-vi).

Fed. R. Civ. P. 37(c)(1).

The timing of plaintiff's disclosure of Exhibit 19 was substantially justified because Metro North's attorney in this case did not know such a document existed. It was not until Metro North's Motion *In Limine* that plaintiff became aware of the *Bush* decision contending that a contract was needed under the FELA for MTA police officers to be considered Metro North's FELA agents, and because the plaintiff did not have possession, custody, or control of ARSA until February 10, 2022.

**THE TIMING OF THE ARSA DISCLOSURE IS HARMLESS TO METRO NORTH**

If for any reason the Court does not find the timing plaintiff's disclosure of ARSA to be substantially justified, the Court should find that the timing of the ARSA disclosure was harmless to Metro-North. Metro North clearly had possession, custody and control of ARSA since 1985. Metro North is a party to ARSA and signed it. It is also an agreement that is regularly used, by its on terms, to determine amounts of money Metro North must pay and collect on a yearly basis. There is no harm to Metro North using a contract it has been a party to for over 35 years, and a document it regularly uses on a yearly, if not monthly basis.

Accordingly, the Court should find that the timing of ARSA's disclosure was both substantially justified and harmless to Metro North and permit the plaintiff to use Exhibit

7

19 to help to avoid an unnecessary issue on appeal concerning the existence of a contract between the MTA and Metro North. *See Advisory Committee Notes for 2000 Amendment*: Fed. R. Civ. P. 37 Subdivision (c) (1) (stating that "[e]ven if the failure was not substantially justified, a party should be allowed to use the material that was not disclosed if the lack of earlier notice was harmless.").

### SUSAN SARCH SHOULD BE PERMITTED TO TESTIFY ABOUT THE ARSA AGREEMENT IF THE COURT DOES NOT INSTRUCT THE JURY THAT MTA POLICE ARE METRO NORTH'S FELA AGENTS IF THEY FIND THEY WERE IN WORKING IN THE SCOPE OF THERE EMPLOYMENT AND IN FURTHERANCE OF METRO NORTH'S BUSINESS OPERATIONS

MTA's General Counsel, Susan Sarch, was identified by plaintiff as a witness to testify about "contractual agreement*s*" (emphasis added) between the MTA and Metro North. Metro North seeks to preclude her from testifying because it incorrectly claims that ARSA does not cover police services at Metro North. Although at the time of the parties' PTO, plaintiff had only disclosed the Trackage Rights Agreement, the disclosure of General Counsel Susan Sarch was not limited to one particular agreement and included her potential testimony about "agreements" and not just the Trackage Rights Agreement. Ms. Sarch is expected to testify, consistent with Plaintiff's Exhibit 19, that Metro North and the MTA have a contractual relationship to run Metro North commuter rail operations in GCT and on the New Haven Line.

### PLAINTIFF'S ADDITIONAL BASES TO GIVE HIS PROPOSED FELA PROOF OF AGENCY JURY INSTRUCTION [Doc. 122-3, p. 9] AND OBJECTIONS TO METRO-NORTH'S PROPOSED FELA JURY INSTRUCTIONS [Doc. 122-3, pp. 10-11]

Even if ARSA did not exist, based on New York statutory law, the Court should instruct the jury that the MTA police officers were Metro North's FELA agents if the jury finds that they were working in the scope of their employment and in furtherance of

8

Metro North's railroad operations when the injuries occurred. Failure to charge the jury accordingly would (1) undermine the remedial nature and purposes of the FELA, and (2) draw an unnecessary and illogical distinction between third parties with a legal obligation to work in furtherance of railroad operations based on whether it was a contractual or statutory obligation to work in furtherance of the same railroad operations.

In assessing whether MTA police officers are "agents" within the meaning of the FELA, the broad purpose of the FELA controls this Court's analysis. *Sinkler v. Missouri Pac. R. Co.*, 356 U.S. 326, 331 (1958). In FELA cases, "justice demands that one who gives his labor to the furtherance of the enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered. If this standard is not met and injury results, the worker is compensated in damages." *Id.* The Court is <u>required</u> to give an accommodating scope to the word 'agents' to give vitality to the standard governing liability of railroads to their workers injured on the job. *Id.* at 332 (emphasis added).

The rationale behind the legal <u>requirement</u> to give an accommodating scope to the word "agent" was cogently set forth in the Supreme Court's decision:

> it was the conception of ... [the FELA] that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. If recovery were denied in this case, the railroads, by the simple expedient of doing each other's work, could tie their employees up in legal technicalities over the proper railroad to sue for injuries and perhaps remove from coverage of the Act a significant area of railroad activity. It would subject the employee once more to the stricter negligence standards of the common law and such debilitating doctrines as assumption of risk.

*Sinkler v. Missouri Pac. R. Co.*, 356 U.S. 326, 330 (1958)

The plaintiff's personal injury claim against the police officers for their negligent or intentional actions in the furtherance of the railroad operational activities is viable under the FELA. *Jamison v. Encarnacion*, 281 U.S. 635, 641 (1930), *superseded by statute on other grounds as recognized in McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991); *see Alpha S.S. Corp. v. Cain*, 281 U.S. 642, 643 (1930) (employer liable for supervisor who hit seaman for tardiness and to get him to work); *Civil v. Waterman Steamship Corp.*, 217 F.2d 94, 98 (2d Cir. 1954) (ship owner liable when employee stabbed another employee with "disciplinary motive"). In *Jamison* a long shoreman was loading a barge when a foreman assaulted him to get him to work faster. *Id.* at 637. The Supreme Court affirmed the jury verdict in favor of the plaintiff and held that even though the assault "was in excess of the authority conferred by the employer upon the foreman, it was committed in the discharge of his duties and in furtherance of the work of the employer's business." *Id.* 641.

In the instant case, the defendant MTA police officers were as much a part of Metro-North's railroad enterprise and acting in furtherance thereof as any other Metro-North employee working in GCT. For example, one of the MTA police officer defendants assisted Metro North Conductors by removing passengers from trains about 80 to 100 times per year. Pl.'s Ex. 5, p. 12, L3-L23; *see* Pl.'s Ex. 4, p. 130, L12-L24. the MTA Police possessed keys to open and close train doors on Metro North trains to assist them work in furtherance of the railroad's operational activities. Pl.'s Ex. 5, p. 12 L4-16.

New York Public Authority Law governs all MTA employees, not just non-police officer employees. *See* N.Y. Pub. Auth. L. § 1264 (providing that the purposes [of the

MTA] are "the continuance, further development and improvement of commuter transportation and other services related thereto ..., including but not limited to such transportation by railroad...."); N.Y. Pub. Auth. L. § 1266(2) (allowing the MTA to operate and maintain any transportation facility); 1266(3) (allowing the MTA to levy and collect fares, rentals, and fees for the use and operation of any transportation facility and related services operated by the MTA or a subsidiary corporation including fares for transportation of passengers); N.Y. Pub. Auth. L. § 1266(4) (empowering the MTA to establish rules and regulations governing conduct and safety of the public for the use and operation of any transportation facility and related services operated by the MTA); N.Y. Pub. Auth. L. § 1266(5) (empowering the MTA to "own, lease,...operate [and] maintain any transportation facilities through, and cause any one or more of its powers, duties, functions or activities to be ... performed by, one or more wholly owned subsidiary corporations of the authority...").

The Court can and should take judicial notice per Fed. R. Evid. 201(c) 1 or (c) 2 that in 1998, the New York State Legislature consolidated police forces from each MTA subsidiary public benefit corporation, the LIRR and Metro-North, into the MTA. *Greene v. Long Island R. Co.*, 280 F.3d 224, 227-228; 240 (2d Cir. 2002). Their work, however, in policing and protecting Metro-North passengers, employees, and property in GCT did not change and the MTA police officers continued their important role in furtherance of Metro-North's operational activities from 1999 to the present. *See Greene*, 280 F.3d at 228; 239-41(holding that with respect to police officers providing security to MTA subsidiary LIRR, the MTA operates an interstate common carrier by railroad within the

11

meaning of the FELA); *Mele*, 2006 WL 2255080 at *2 (S.D.N.Y. Aug. 4, 2006) ("The MTA operates as an interstate common carrier within the meaning of the FELA.").

In *Sinkler* a contract existed between the defendant railroad and the company responsible for switching defendant's train cars in a terminal. The *Sinkler* Supreme Court, based on the facts before it, held that "when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of Sec. 1 of the FELA." *Sinkler*, 356 U.S. at 332-333. A contract, however, is just one type of legal obligation. In the instant case, MTA police, like the third-party in *Sinkler* were under a legal obligation to work in furtherance of the defendant's railroad operations. The MTA police officers were under a statutory obligation to work in furtherance of Metro North's railroad operations. By applying the same legal analysis used by the Supreme Court in *Sinkler, supra*, this Court, even in the absence of ARSA, should give plaintiff's proposed FELA proof of agency jury instruction, and not give Metro North's proposed instruction.

The defendant's FELA agency charge, pp. 10-11, runs explicitly afoul of *Sinkler* in that it proposes factors for a jury to consider in determining whether an FELA "agency" relationship exists. The *Sinkler* Court made it clear that the corporate autonomy of the third party, and its freedom from detailed supervision of its operations by Metro-North **are irrelevant** provided that at the time of the alleged incident, the third party was engaged in furthering the operational activities of the defendant. *Sinkler*, 356 U.S. at 332 (emphasis added). To support their proposed charge, the defendants mistakenly rely on two cases easily distinguished from the facts before the Court in the

instant case. The *Knight v. State University of New York Stony Brook*, 880 F.3d 636 (2d Cir. 2018) case is not a FELA case and does not involve FELA agency - it is a TITLE VII retaliation claim applying common law agency principles to determine if the plaintiff is an employee of the defendant. *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 324-325 is a FELA case, however, its holding and analysis is limited to determining whether a plaintiff working for a non-railroad company under contract with a railroad can be considered "an employee" of the railroad and bring a FELA claim against the railroad. *See Kelley*, 419 U.S. at 323, 324, 326, 327 (indicating repeatedly the "while employed" clause of the FELA was the subject of their analysis and holding). In the instant case, there is no dispute that the plaintiff was Metro North's employee at the time of the incident. The meaning of the "agent" language from the FELA is what the parties are disputing in this case, not whether or not the plaintiff was employed by Metro North.

The MTA police were legally obligated by both ARSA and statutory law to work in furtherance of Metro North's railroad operations in GCT and any negligent actions or inactions of the MTA police officers should be attributed to Metro North if a jury finds that such conduct was done in the course of their employment and in furtherance of Metro North's business objectives. *See Moran v. MTA Metro North Railroad Co.*, 2012 WL 1226771 p. 5 (S.D.N.Y. March 31, 2021).

## THE PLAINTIFF'S NON-DELEGABLE DUTY CHARGE SHOULD BE GIVEN

Metro North contends that this charge is not appropriate because the Trainmaster was employed by Metro North and, according to Metro North, could not have violated Metro North's non-delegable duty to provide a safe place to work. The nondelegable charge is appropriate because Metro North's defense to FELA liability for

13

actions and inaction of the MTA police officers is by offering evidence that they were not Metro North's employees or agents. Metro North's FELA defense attempts to delegate its non-delegable duty to provide the plaintiff with a reasonably safe place to work to another entity: the MTA. That is a violation of FELA non-delegable duty. Also, the charge is appropriate because Trainmaster Martin himself could be found negligent for not resolving the dispute between the plaintiff and the police and abdicating his control of the situation and leaving it for the MTA police to resolve.

"A railroad has the nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the railroad has no control." *Shenker v. Balitimore & O.R. Co.*, 374 U.S. 1, 8 (1963)(citations omitted)(confirming this broad legal proposition is in accord with other Supreme Court opinions: *Bailey v. Central Vermont R. Co.*, 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; *Ellis v. Union Pac. R. Co.*, 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; *Harris v. Pennsylvania R. Co.*, 361 U.S. 15, 80 S.Ct. 22, 4 L.Ed.2d 1, reversing 168 Ohio St. 582, 156 N.E.2d 822). "Under the FELA the employer is the one owing the duty to the employee. The employee need not look elsewhere for his protection. He has a right under the FELA to rely on his employer and none other. When the employer delegates its duty, or abdicates its control, the employer takes the risk, not the employee." *Payne v. Baltimore & Ohio R.R. Co.*, 309 F.2d 546 (6th Cir. 1962), *cert. denied*, 374 U.S. 827, 10 L. Ed. 2d 1051

In *Shenker*, the Supreme Court concluded that the trial court properly upheld the jury's verdict finding defendant Baltimore O&R. Co. ("O&R") negligent under the FELA for failing to inspect and provide its employee with a reasonably safe railcar that was

14

owned by another railroad. *Id.* at 9. The plaintiff in *Shenker* was a janitor who was injured while trying to push large mail bags through a defective door on another railroad's railcar that did not open all the way. The other railroad's railcar was on the other railroad's track and the plaintiff was standing on the other railroad's platform. *Id.* at 3. The Supreme Court reached this conclusion five years after *Sinkler* and in the absence of any evidence of a contract between the B&O and the other railroad. The Supreme Court simply inferred that the "tenor of the services that B&O provides for the [other railroad] speaks of an agreement by the B&O to manage and operate the [other railroad's] station." *Id* at 7 (emphasis added). In the instant case, the jury should be instructed about Metro North's non-delegable duty to provide a reasonably safe place to work so they can fairly and accurately assess whether the MTA police were Metro North's FELA agents and whether Metro North Trainmaster Martin violated this duty by not promptly and properly investigating and resolving the dispute between the plaintiff and MTA Police Officers concerning a passenger traveling between GCT and 125th Street.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion *In Limine* in its entirety and instruct the Jury in accordance with Plaintiff's requested FELA jury instructions.

Respectfully submitted,
FOR THE PLAINTIFF

By  /s/ George J. Cahill, Jr.
George J. Cahill, Jr. (ct04485)
CAHILL & PERRY, P.C.
43 Trumbull Street
New Haven, Connecticut 06510
Telephone: (203) 777-1000
Fax: (203) 865-5904
cahill@trainlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2022, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 /s/ George J. Cahill, Jr.
George J. Cahill, Jr.