App'x 1



# AEA

## ANALYTICAL ECONOMICS ASSOCIATES

Economic Expert Report of:
Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF

In the Matter of:

*Thomas M. Moran*
*v.*
*MTA Metro-North Railroad Company, et al.*

United States District Court
Southern District of New York
19-CV-03079-AT

March 9, 2020



DEFENDANT'S
EXHIBIT
Blumberg No. 5114

# Table of Contents

I.      Introduction and Background to the Assignment ............................................... 3

II.     List of Documents ................................................................................................ 4

III.    Summary of Opinion ............................................................................................ 6

IV.     Commentary on Analysis of Alleged Economic Damages by Dr. Shapiro ................. 7

        A) Scenario of Continued Employment with the MTA-MN Until Age 65 is
           Speculative and Unsupported ........................................................................ 7

        B) Measure of "Additional Wages" is Significantly Overstated and
           Misleading ................................................................................................... 9

        C) Cost of Replacement Health Insurance is Inapplicable and Misleading .................... 13

        D) Rate of Increase in Maximum Tier I and Tier II Wages ............................... 14

        E) Computational Errors in the Calculations .................................................. 15

V.      Analysis of Alleged Economic Damages – Corrections to Dr. Shapiro's Analysis ... 16

## I.   Introduction and Background to the Assignment

I am Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF, President and Chief Economist of Analytical Economics Associates LLC (AEA).  AEA is a consulting firm based in Morristown, NJ dedicated to the evaluation and estimation of economic damages in legal disputes.  My qualifications and credentials include a Doctor of Philosophy (Ph.D.) degree in Economics from Florida State University (Tallahassee, Florida) and a Bachelor of Science degree in Economics from Universidad Central de Venezuela (Caracas, Venezuela). I hold a Certified Forensic Examiner (CFE) license awarded by the Association of Certified Fraud Examiners (ACFE), and a Master Analyst in Financial Forensics license (MAFF) awarded by the National Association of Certified Valuators and Analysts (NACVA).  My Curriculum Vitae is attached to this report as Exhibit "A".

I have been retained by The Law Offices of Steve S. Efron, counsel for MTA Metro-North Railroad Company, to provide my opinion regarding the analysis of alleged economic damages to put forth by Steven J. Shapiro, Ph.D. (Dr. Shapiro) as set forth through Expert Report Concerning Thomas Moran's Lost Earnings Capacity dated December 14, 2019 and the Supplemental Expert Report Concerning Thomas Moran's Lost Earnings Capacity dated January 31, 2020 (jointly referenced hereby as Dr. Shapiro's report) and to provide analysis and professional opinion regarding the potential economic damages to Mr. Thomas Moran (Mr. Moran) in connection with this litigation.

Section II of this report provides the list of case-specific documents received over the course of this engagement, as well as other sources independently obtained and consulted for purposes of this analysis. The summary of my professional opinions and analysis is presented in Section III. Section IV presents my commentary regarding the analysis of Mr. Moran's alleged economic damages put forth by Dr. Shapiro. Section V delineates the corrections made to Dr. Shapiro's analysis in order to properly estimate the amount of Mr. Moran's alleges economic damages.

## II.    List of Documents

The following records have been reviewed over the course of this engagement and have been considered in forming my opinions:

1. M.T.A. Police Department Incident Report dated 08/04/2017.

2. Deposition of Thomas Moran dated October 2, 3019.

3. Agreement Between Metro-North Railroad and Association of Commuter Rail Employees as the Bargaining Representative of Conductors, Assistant Conductors and Hostlers Employed by Metro-North, Effective: January 1, 2007 – June 15, 2010.

4. Memorandum of Understanding Between MTA Metro-North and Association of Commuter Rail Employees Division 1, Representing Conductors and Assistant Conductors for the period January 16, 2017 through September 1, 2019.

5. Report on Findings and recommendations for the Metropolitan Transportation Authority, Overtime Policies and Procedures, Submitted by Carrie H. Cohen, Morrison & Foerster LLP to the Metropolitan Transportation Authority, Office of the General Counsel dated August 15, 2019.

6. Article 12 – Defined Benefit Retirement Program for Represented Employees of the Commuter Rails (Long Island Rail Road and the Metro-North Commuter Railroad) effective January 1, 2004. (No cover page or document title).

7. MTA Defined Benefit Pension Plan for Employees of Metro North Railroad (MNR). (Document in slides format, annotations on page 42 indicate that this is a brief summary of the MTA DBPP).

8. Time Detail (Excel Spreadsheet) for Thomas Moran 08/04/2014-08/04/2017 (no titles or document coversheet included).

9. PeopleSoft Production, TRC to Earn Code Mapping, Run date 08/26/2019.

10. U.S. Individual Income Tax Return of Thomas M. Moran for years 2014-2018.

11. Form W-2 Wage and Tax Statement for years 2012-2018.

12. Expert Report Concerning Thomas Moran's Lost Earnings Capacity 2019 by Steven J. Shapiro, Ph.D. dated December 14.

13. Supplemental Expert Report Concerning Thomas Moran's Lost Earnings Capacity by Steven J. Shapiro, Ph.D. dated January 31, 2020.

14. Vocational Opinion report by Jeffrey Joy, Ph.D., MBA, CRC, CEA, ABVE-D, IPEC dated December 11, 2019.

15. Letter by George J. Cahill, Jr. to Steven J. Shapiro, Ph.D. dated September 10, 2019 enclosing Mr. Moran's payroll records.

16. Letter by George J. Cahill, Jr. to Steven J. Shapiro, Ph.D. dated August 9, 2019 enclosing various documents and records.

In addition to the above-listed documents, the following documents and sources were independently obtained and considered for this analysis:

17. Article 12: Defined Benefit retirement Program for Represented Employees of the Commuter Rails dated May 3, 2005, effective January 1, 2004.

18. Supreme Court of the United States, BNSF Railway Co, v. Loos, Certiorari to The United States Court of Appeals for the Eighth Circuit, No. 17-1042. Argued November 6, 2018 – Decided March 4, 2019.

19. Metropolitan Transportation Authority Defined Benefit Pension Plan, Financial Statements as of and for the Years Ended December 31, 2017 and 2016, Supplemental Schedules, and Auditors' Report.

20. Metropolitan Transportation Authority Independent Auditor's Review Report, Consolidated Interim Financial Statements as of and for the Nine-Month Period Ended September 30, 2018.

21. Projected Maximum Earnings Bases Under June 2019 Office of Management and Budget Economic Assumptions 2020-2029.

22. U.S. Railroad Retirement Board, Bureau of the Actuary, November 2016: Tax Rates and Maximum Taxable Earnings under Social Security, Railroad Retirement and Railroad Unemployment Insurance Programs 1937-2017 (www.rrb.gov).

23. U.S. Railroad Retirement Board: RRB News: Railroad Retirement and Unemployment Insurance Taxes in 2018.

24. U.S. Railroad Retirement Board: RRB News: Railroad Retirement and Unemployment Insurance Taxes in 2019.

25. U.S. Railroad Retirement Board: RRB News: Railroad Retirement and Unemployment Insurance Taxes in 2020.

26. Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger: The Markov Process of Labor Force Activity 2012-2017: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors. *Journal of Forensic Economics* 28(1-2), 2019, pp. 15-108. National Association of Forensic Economics 2019.

27. Centers for Disease Control and Prevention: National Vital Statistics Reports, *United States Life Tables, 2017*. Volume 68, Number 7, June 24, 2019.

## III.   Summary of Opinion

The analysis and opinions delineated in this report regarding the alleged potential economic damages to Mr. Moran are based on the facts and information extracted from the records, documents, and information available as of the date of this report.

The estimated amount of Mr. Moran's alleged potential economic damages is based on the premise of a finding of liability, and based on the assumption that, in the absence of the alleged wrongdoing, Mr. Moran may have continued to work for the MTA Metro-North (MTA-MN) in the same capacity as Conductor until his age of eligibility for retirement.

In the event of a finding of liability, it is my professional opinion that the estimated amount of Mr. Moran's economic damages is as follows:

### Summary of Economic Damages in Nominal Terms

|                                                              | Age 60      | Age 62      |
|--------------------------------------------------------------|-------------|-------------|
| Past Loss (Date of Incident to 12/13/2019)                   | $281,474    | $281,474    |
| Net Future Loss of Wages and Pension (from 12/14/19 to Worklife) | $1,842,602  | $2,252,726  |
| **Total Past and Future Loss**                               | $2,124,076  | $2,534,200  |

### Summary of Economic Damages in Present Value Terms

|                                                              | Age 60      | Age 62      |
|--------------------------------------------------------------|-------------|-------------|
| Past Loss (Date of Incident to 12/13/2019)                   | $281,474    | $281,474    |
| Net Present Value of Future Loss of Wages and Pension (from 12/14/19 to Worklife) | $1,425,810  | $1,688,704  |
| **Total Past and Present Value of Future Loss**              | $1,707,284  | $1,970,177  |

Exhibits offering all the details of the analysis of Mr. Moran's alleged economic damages are presented at the end of this report.

## IV.   Commentary on Analysis of Alleged Economic Damages by Dr. Shapiro

Based on my review of the records and information available as of the date of this report, it is my professional opinion that the analysis of alleged economic damages set forth in Dr. Shapiro's report is flawed and unreliable because certain of the assumptions made by Dr. Shapiro are contradicted by available records and information, and because the calculations made by Dr. Shapiro contain several errors.  It is further my professional opinion that the estimate of Mr. Moran's alleged economic damages presented in Dr. Shapiro's report is unreliable and significantly overstated, and it results in a significant windfall to Mr. Moran for the following reasons:

### A) Scenario of Continued Employment with the MTA-MN Until Age 65 is Speculative and Unsupported

Dr. Shapiro's scenario under which it is assumed that Mr. Moran may have continued to work as an MTA-MN until age 65 is speculative, and it results in a measure of Mr. Moran's alleged economic damages that is significantly overstated for the following reasons:

1.  By assuming that Mr. Moran would have worked until age 65, Dr. Shapiro failed to recognize that the applicable pension plan does not present any discussions regarding age 65 as one of the retirement eligibility age options. Therefore, this scenario of the alleged economic damages is presented without a basis.

2.  By assuming that Mr. Moran would have worked until age 65, Dr. Shapiro failed to recognize that this alleged scenario is contradicted by the rules of eligibility set forth in the applicable pension plan.[1] According to the applicable pension plan, employees of the MTA-MN are

---

[1] Article 12 – Defined Benefit Retirement Program for Represented Employees of the Commuter Rails (Long Island Rail Road and the Metro-North Commuter Railroad) effective January 1, 2004. (No cover page or document title).

Article 12: Defined Benefit retirement Program for Represented Employees of the Commuter Rails dated May 3, 2005, effective January 1, 2004.

eligible to retire upon reaching age 62 with an unreduced pension. Moreover, employees of the MTA-MN are eligible to receive a retirement pension benefit upon reaching age 60 (albeit slightly reduced) contingent on the accrual of five years of service. Furthermore, employees are eligible to retire upon reaching age 55 contingent on the accrual of 30 years of service.

3. By assuming that Mr. Moran would have worked until age 65, Dr. Shapiro failed to recognize that, given the years of service that Mr. Moran had accrued as of the date of the incident, he would have reached 30 years of service at age 61, and would have been eligible to retire with an unreduced pension at that time.

By assuming that Mr. Moran would have continued to work until age 65, Dr. Shapiro has overstated the number of years during which the alleged loss of wages is calculated, thereby significantly overstating the amount of Mr. Moran's alleged loss of annual wages.

Because Dr. Shapiro also extends the projection of the alleged loss of health insurance to age 65, by overstating the number of Mr. Moran's remaining years of employment with the MTA-MN, Dr. Shapiro has overstated the amount of Mr. Moran's alleged loss of fringe benefits.

Because years of service (YOS) and Final Average Salary (FAS) are components of the formula by which retirement pension benefits are computed, by projecting Mr. Moran's wages until age 65, Dr. Shapiro has overstated the YOS that Mr. Moran would have accrued at the time of retirement. Furthermore, because wages are projected to increase at a rate of 2.5% per year, by assuming that Mr. Moran would have continued to work until age 65, Dr. Shapiro has also overstated Mr. Moran's FAS, thereby overstating the amount of retirement pension benefits that Mr. Moran may have been eligible for.

---

MTA Defined Benefit Pension Plan for Employees of Metro North Railroad (MNR). (Document in slides format, annotations on page 42 indicate that this is a brief summary of the MTA DBPP).

Therefore, by making the assumption that Mr. Moran may have continued to work as an employee of the MTA-MN until age 65, Dr. Shapiro has overstated the amount of Mr. Moran's alleged loss of wages, fringe benefits, and pension.

B) <u>Measure of "Additional Wages" is Significantly Overstated and Misleading</u>

Dr. Shapiro's assumption that Mr. Moran's total annual wages would have included "additional wages" (also referred to as "extra wages") in an amount equivalent to 126.2% of base wages is speculative and miscalculated, and it results in a measure of Mr. Moran's alleged economic damages that is significantly overstated and misleading for the following reasons:

1. Dr. Shapiro asserts that the determination of the amount in "additional wages" was made based on a review of the payroll records. Dr. Shapiro, however, failed to provide any further details regarding the methodology applied for the review of said payroll records, and failed to provide any discussion regarding the details of how he arrived at the conclusion that "additional wages" would be equivalent to 126.2% of base salary.

2. Dr. Shapiro provide no commentary with regards to the fact that the payroll records include approximately 35 different payroll codes and provided no discussion regarding what codes are considered in his analysis.

3. Dr. Shapiro failed to recognize that the payroll records cover the period from August 4, 2014 to August 4, 2017 only provide information on two complete calendar years of employment, i.e., 2015 and 2016. In doing so, Dr. Shapiro failed to consider data and information available for the full calendar years 2012, 2013, and 2014.

4. According to letters sent to Dr. Shapiro included in the records produced to date, Dr. Shapiro was provided with Mr. Moran's W-2 records for years 2012-2018.[2] However, Dr. Shapiro's report does not provide any discussion regarding Mr. Moran's historical earnings based on his W-2 records. In fact, Dr. Shapiro's report does not include Mr. Moran's tax returns or W-2 records among the documents listed on Dr. Shapiro's report Exhibit 1 titled "Documents Relied Upon". It is unclear why Dr. Shapiro decided not to rely on tax returns and W-2 records.[3]

5. By not relying upon Mr. Moran's W-2 records, Dr. Shapiro failed to take into consideration Mr. Moran's historical earnings, which reveal that year 2015 is a significant outlier in the wages reported for Mr. Moran. In fact, W-2 records show the following annual wage earnings for the years preceding the year of the incident:

| Year | W-2 Wages |
|------|-----------|
| 2012 | $125,560 |
| 2013 | $133,028 |
| 2014 | $143,755 |
| 2015 | $206,585 |
| 2016 | $162,680 |

By not taking into consideration the historical data that is provided through W-2 records, Dr. Shapiro failed to recognize, not only that year 2015 is an outlier in reported earnings, but also that the pattern in Mr. Moran's historical wages that clearly suggests that Mr. Moran's total wages increased by an approximate amount of $10,000 to $11,000 per year.

---

[2] Letter by George J. Cahill, Jr. to Steven J. Shapiro, Ph.D. dated September 10, 2019 enclosing Mr. Moran's payroll records.

Letter by George J. Cahill, Jr. to Steven J. Shapiro, Ph.D. dated August 9, 2019 enclosing various documents and records.

U.S. Individual Income Tax Return of Thomas M. Moran for years 2014-2018 and Form W-2 Wage and Tax Statement for years 2012-2018.

[3] U.S. Individual Income Tax Return of Thomas M. Moran for years 2014-2018 and Form W-2 Wage and Tax Statement for years 2012-2018.

6. By not taking into consideration the historical data that is provided through W-2 records, Dr. Shapiro failed to recognize that Mr. Moran's average wages for years 2014 and 2016 (the two years that surround the outlier year) equal approximately $153,217, and that such figure, if used to temporarily substitute the wages reported in 2015, provides a history of annual wages that is consistent with the wages reported in all other years. The following table reflects the results of the effects of this approach:

| Year | W-2 Wages | W-2 Wages with Adjustment |
|------|-----------|---------------------------|
| 2012 | $125,560  | $125,560                  |
| 2013 | $133,028  | $133,028                  |
| 2014 | $143,755  | $143,755                  |
| 2015 | $206,585  | **$153,217**              |
| 2016 | $162,680  | $162,680                  |

As can be noted from the above table, if one were to replace the actual wages reported in 2015 with the average of the wages reported in the year before and the year after 2015, the pattern of historical wages is consistent from year 2012 to year 2016. This exercise confirms that the wages reported for year 2015 are likely an anomaly that Dr. Shapiro failed to take into consideration.

7. By not taking into consideration the available tax returns and W-2 records, Dr. Shapiro limited his analysis to years 2015 and 2016 as calendar years, which provided to Dr. Shapiro with only a limited view of Mr. Moran's historical wages.

8. By not taking into consideration the historical data that is provided through W-2 records, Dr. Shapiro failed to fully evaluate the historical data pertaining to Mr. Moran's "additional wages." The table below reports Mr. Moran's W-2 wages and the estimated "additional wages" expressed in percentage terms relative to base wages:

| Year | W-2 Wages | "Additional Wages" As % of Base Wages |
|------|-----------|----------------------------------------|
| 2012 | $125,560 | 53.7% |
| 2013 | $133,028 | 58.0% |
| 2014 | $143,755 | 65.8% |
| 2015 | $206,585 | 131.2% |
| 2016 | $162,680 | 79.4% |
| Average 2012-2016 | | 77.6% |

As can be noted from this table, Mr. Moran's "additional wages" represented a premium over base wages that is equivalent to 77.6%, not 126.2%.

9. By not taking into consideration the historical data that is provided through W-2 records, Dr. Shapiro failed to fully evaluate the historical data pertaining to Mr. Moran's "additional wages" and failed to recognize that, if the wages reported in 2015 were to be temporarily substituted with the average of the wages reported in 2014 and 2016, the "additional wages" expressed as a percentage of base wages would have revealed the following:

| | | W-2 Wages with Adjustment |
|------|-----------|----------------------------------------|
| Year | W-2 Wages | "Additional Wages" As % of Base Wages |
| 2012 | $125,560 | 53.7% |
| 2013 | $133,028 | 58.0% |
| 2014 | $143,755 | 65.8% |
| 2015 | **$153,217** | 71.5% |
| 2016 | $162,680 | 79.4% |
| Average 2012-2016 | | 65.7% |

As can be noted from this table, Mr. Moran's "additional wages" represented a premium over base wages that is equivalent to 65.7%, not 126.2%.

10. Dr. Shapiro failed to recognize that the totals reported in the payroll records for years 2015 and 2016 are very different from the amounts reported in Mr. Moran's W-2 records.

---

Therefore, by relying solely on payroll records and by not reviewing the history of total wages that is available through the tax returns and W-2 records that have been produced to date, Dr. Shapiro has utilized data that is more reflective of an outlier year than utilizing data that would provide a more consistent view of Mr. Moran's historical "additional wages." By doing so, Dr. Shapiro has overstated the amount that Mr. Moran may have earned in "additional wages", thereby significantly overstating the amount of Mr. Moran's alleged economic damages.

Furthermore, because wages are projected to increase at a rate of 2.5% per year, by overstating the amount that Mr. Moran may have earned in "additional wages", Dr. Shapiro has significantly overstated Mr. Moran's FAS. Because FAS is a component of the formula by which retirement pension benefits are computed, by overstating the amount of Mr. Moran's "additional wages," Dr. Shapiro has also significantly overstated the FAS upon which the amount of the pension is calculated, thereby significantly overstating the amount of Mr. Moran's alleged loss of pension.

### C) Cost of Replacement Health Insurance is Inapplicable and Misleading

Dr. Shapiro assumed that Mr. Moran's alleged economic damages include the cost of replacement health insurance coverage, and assumed that such cost would be equivalent to 15.94% of Mr. Moran's base wages, and asserts that this approach is based on the estimates of the cost of health insurance calculations by the MTA-MN. Dr. Shapiro's approach to the calculation of the cost or value of alleged lost health insurance coverage results in a significant overstatement of Mr. Moran's alleged economic damages for the following reasons:

1. Mr. Moran has continued to receive health insurance coverage through the MTA-MN. In fact, according to the September 2018 Auditors' Report, the MTA participates in the New York State Health Insurance Program (NYSHIP) through which it provides health insurance

coverage, as well as other benefits, to its retirees. Therefore, no cost of replacement health insurance is to be included as a category of alleged economic damages.[4]

2. Even if the cost of replacement health insurance were an applicable category of economic damages in this case, Dr. Shapiro's methodology is erroneous. In fact, Dr. Shapiro conflated the cost to the employer for the provision of health insurance coverage and the amount in premium that an individual may face for independently obtained health insurance coverage. However, it is simply not the case that the cost of independently obtained health insurance coverage would equate the amount of the premium paid by a former employer.

3. Even if the cost of replacement health insurance were an applicable category of economic damages in this case, Dr. Shapiro's methodology is erroneous. In fact, Dr. Shapiro failed to recognize that it is simply not the case that the cost of premium for health insurance coverage that is independently obtained would follow the pattern of wage increases applicable to the wages earned from a former employer.

## D) Rate of Increase in Maximum Tier I and Tier II Wages

Dr. Shapiro assumed that the maximum wages that would be subject to Tier I contributions to the railroad retirement (Tier I) would increase at a rate of 2.6% per year commencing in year 2021, and that the maximum wages that would be subject to Tier II contributions to the railroad retirement (Tier II) would increase at a rate of 2.9% per year commencing in year 2021. Dr. Shapiro's assumptions regarding this component of the analysis is based on the maximum applicable wages for Tier I and Tier II contributions since 2017.

The maximum wages applicable to the calculation of contributions to Tier I correspond to the maximum Social Security wages set forth by the Social Security Administration (SSA).

---

[4] Metropolitan Transportation Authority Independent Auditor's Review Report, Consolidated Interim Financial Statements as of and for the Nine-Month Period Ended September 30, 2018.

While this corresponds to a minor component of the analysis, and one that has only a minor effect on the estimate of damages, it is important to note that, over the last five years (since 2012), the maximum Social Security wages have increased at a rate of 3.1%, not 2.6%.

By assuming that such wages would have increased at a rate of 2.6% per year, Dr. Shapiro has underestimated the amount of the maximum Tier I contributory wages, thereby slightly overstating the amount of Mr. Moran's alleged loss of wages.

### E) Computational Errors in the Calculations

The calculations presented in the tables accompanying Dr. Shapiro's report reflect the following mathematical/computational errors:

1. In the calculations of Mr. Moran's alleged Past Loss, Dr. Shapiro computed the amount of "additional wages" based on the assumption that such would be equivalent to 126.2% of base wages. However, in adding the various components of the alleged loss, the "additional wages" are not added to arrive at the figure of Net Loss presented on Exhibit 4 of Dr. Shapiro's report. By making this computational error, Dr. Shapiro understated the amount of Mr. Moran's Past Loss.

2. In the calculations of Mr. Moran's alleged Future Loss presented on Exhibit 6 and Exhibit 10 of Dr. Shapiro's report, Dr. Shapiro failed to subtract the required Tier 1 contributions that Mr. Moran would have faced had he continued to work as an employee of the MTA-MN in each and every year. By making this computational error, Dr. Shapiro overstated the amount of Mr. Moran's Future Loss.

## V.  Analysis of Alleged Economic Damages – Corrections to Dr. Shapiro's Analysis

Based on the discussion delineated in the previous sections of the analysis of Mr. Moran's alleged economic damages is constructed by incorporating the following necessary corrections and adjustments to the analysis presented by Dr. Shapiro:

1. **Scenario of Continued Employment to Age 65 is Excluded:** The assumption that Mr. Moran would have worked until age 65 is eliminated as such a scenario of remaining working years as an employee of the MTA-MN is invalid and contradicted by the rules of eligibility for retirement pension benefits set forth in the applicable pension plan.

2. **Additional Wages (Extra Wages):** Based on the data available regarding Mr. Moran's historical wages, the amount of Mr. Moran's "additional wages" are calculated to be equivalent to an additional 77.6% of Mr. Moran's base wages.

3. **Past Loss – Correction to Include "Extra Wages":** The calculation of Mr. Moran's Past Loss is corrected to include the "Extra Wages" category that Dr. Shapiro failed to include. However, and per the prior point, the calculation of "Extra Wages" is based on the assumption that such may have been equivalent to 77.6% of Mr. Moran's base wages.

4. **Future Loss (Age 60 and Age 62) – Tier 1 Contributions:** The calculation of the future loss is corrected to subtract the Tier 1 mandatory contributions that Mr. Moran would have had to make for the duration of his employment with the MTS-MN.

5. **Rate of Increase in Maximum Wages for Calculation of Tier I Contributions:** The maximum Social Security wages have increased at an average rate of 3.1% per year over the last five years (since 2012). Accordingly, the calculations are corrected to reflect this rate of increase.

6. <u>Projection of Pension Loss</u>: The projection of Mr. Moran's alleged forgone pension benefits is corrected consequentially to the recalculation of Mr. Moran's total annual wages projection. The FAS that results from the recalculated projection of Mr. Moran's MTA-MN total wages is utilized in the formula for the estimation of alleged foregone pension benefits.

7. <u>No Health Insurance Loss</u>: Because Mr. Moran is eligible to receive health insurance coverage as an MTA-MN retiree, all calculations related to health insurance coverage are eliminated from the projection of Mr. Moran's pre-incident wages as well as from the projection of Mr. Moran's residual earning capacity.

The details of the recalculation of Mr. Moran's alleged economic damages are presented in the exhibits that follow. The exhibits presented follow the same exhibit numbering as in Dr. Shapiro's report. This approach to the exhibit numbering is taken in order to facilitate the reader's side-by-side review of and comparison to Dr. Shapiro's exhibits.

The discussion and analysis delineated throughout the various sections of this report is based on the records and information available to date. Should any additional information become available before or at trial that would significantly affect the results of my analysis, I reserve the right to update my analysis and to supplement this report accordingly, if requested.

Respectfully submitted,

Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF

**Dr. Shapiro Exhibit 4 - Corrected:** Thomas Moran's Lost Compensation through December 13, 2019

| Year | Age | Base Wages 2.50% | Extra Wages 77.6% | Health Benefits | Tier I Contribution 6.20% | Tier II Contribution 4.90% | Medicare Contribution 1.45% | Income Taxes | Net Loss |
|------|-----|------------------|-------------------|-----------------|---------------------------|----------------------------|-----------------------------|--------------|----------|
| 2017.59 | 48.34 | $37,946 | $29,449 | | - | - | (977) | (14,015) | 52,403 |
| 2018 | 48.75 | $94,980 | $73,712 | | (7,961) | (4,675) | (2,446) | (35,936) | 117,674 |
| 2019 | 49.75 | $90,580 | $70,298 | | (8,240) | (4,836) | (2,333) | (34,073) | 111,396 |
| | | | | | | | | | 281,474 |

Dr. Shapiro Exhibit 6 - Corrected: Thomas Moran's Future Lost Compensation: Thomas Moran Works Until Age 60

| Year | Age | Base Wages 2.50% | Extra Wages 77.6% | Health Benefits | Metro North Pension | Tier I Contribution 6.20% | Tier II Contribution 4.90% | Medicare Contribution 1.45% | Additional Medicare Tax | Income Taxes | Net Compensation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Compensation in the Absence of Injury | | | | | |
| 2019.95 | 50.70 | 4,699 | 3,647 | | | - | - | (121) | | (1,767) | 6,457 |
| 2020 | 50.75 | 97,662 | 75,794 | | | (8,537) | (5,013) | (2,515) | | (36,885) | 129,042 |
| 2021 | 51.75 | 100,104 | 77,689 | | | (8,800) | (5,158) | (2,578) | | (37,992) | 132,066 |
| 2022 | 52.75 | 102,608 | 79,632 | | | (9,071) | (5,308) | (2,642) | | (39,128) | 126,091 |
| 2023 | 53.75 | 105,174 | 81,624 | | | (9,351) | (5,462) | (2,709) | | (40,295) | 128,982 |
| 2024 | 54.75 | 107,804 | 83,665 | | | (9,639) | (5,620) | (2,776) | | (41,493) | 131,941 |
| 2025 | 55.75 | 110,500 | 85,757 | | | (9,936) | (5,783) | (2,846) | | (42,724) | 134,969 |
| 2026 | 56.75 | 113,264 | 87,902 | | | (10,242) | (5,951) | (2,917) | | (43,989) | 138,068 |
| 2027 | 57.75 | 116,096 | 90,100 | | | (10,557) | (6,123) | (2,990) | | (45,286) | 141,240 |
| 2028 | 58.75 | 119,000 | 92,354 | | | (10,883) | (6,301) | (3,065) | | (46,618) | 144,487 |
| 2029 | 59.75 | 30,745 | 23,861 | | 70,546 | (3,386) | (2,676) | (792) | | (21,886) | 96,413 |
| 2030 | 60.75 | | | | 105,818 | | | | | (16,495) | 89,323 |
| 2031 | 61.75 | | | | 105,818 | | | | | (16,326) | 89,492 |
| 2032 | 62.75 | | | | 105,818 | | | | | (16,154) | 89,664 |
| 2033 | 63.75 | | | | 105,818 | | | | | (15,980) | 89,838 |
| 2034 | 64.75 | | | | 105,818 | | | | | (15,803) | 90,015 |
| 2035 | 65.75 | | | | 105,818 | | | | | (15,624) | 90,194 |
| 2036 | 66.75 | | | | 105,818 | | | | | (15,443) | 90,376 |
| 2037 | 67.75 | | | | 105,818 | | | | | (15,258) | 90,560 |
| 2038 | 68.75 | | | | 105,818 | | | | | (15,072) | 90,747 |
| 2039 | 69.75 | | | | 105,818 | | | | | (14,882) | 90,936 |
| 2040 | 70.75 | | | | 105,818 | | | | | (14,690) | 91,129 |
| 2041 | 71.75 | | | | 105,818 | | | | | (14,631) | 91,187 |
| 2042 | 72.75 | | | | 105,818 | | | | | (14,584) | 91,234 |
| 2043 | 73.75 | | | | 105,818 | | | | | (14,536) | 91,283 |
| 2044 | 74.75 | | | | 105,818 | | | | | (14,486) | 91,332 |
| 2045 | 75.75 | | | | 105,818 | | | | | (14,436) | 91,383 |
| 2046 | 76.75 | | | | 105,818 | | | | | (14,385) | 91,433 |
| 2047 | 77.75 | | | | 105,818 | | | | | (14,333) | 91,485 |
| 2048 | 78.75 | | | | 86,771 | | | | | (11,754) | 75,017 |

Dr. Shapiro Exhibit 6 - Corrected: (continued)

| Year | Age | Metro North Pension | Wages 2.52% | Health Benefits 2.52% | Retirement Benefits 5.80% | Social Security and Medicare | Income Tax | Net Compensation | Net Loss |
|------|-----|---------------------|-------------|----------------------|---------------------------|------------------------------|------------|------------------|----------|
| | | | | | | Post-Injury Compensation | | | |
| 2019.95 | 50.70 | | | | | | | - | 6,457 |
| 2020 | 50.75 | | 18,485 | | 1,072 | (1,414) | - | 18,143 | 110,899 |
| 2021 | 51.75 | | 37,592 | | 2,180 | (2,876) | (1,556) | 35,340 | 96,725 |
| 2022 | 52.75 | | 38,539 | | 2,235 | (2,948) | (1,647) | 36,179 | 89,911 |
| 2023 | 53.75 | | 39,509 | | 2,292 | (3,022) | (1,740) | 37,038 | 91,943 |
| 2024 | 54.75 | | 40,504 | | 2,349 | (3,099) | (1,898) | 37,857 | 94,083 |
| 2025 | 55.75 | | 41,524 | | 2,408 | (3,177) | (2,069) | 38,688 | 96,281 |
| 2026 | 56.75 | | 42,570 | | 2,469 | (3,257) | (2,181) | 39,602 | 98,466 |
| 2027 | 57.75 | | 43,642 | | 2,531 | (3,339) | (2,297) | 40,538 | 100,702 |
| 2028 | 58.75 | | 44,741 | | 2,595 | (3,423) | (2,415) | 41,499 | 102,989 |
| 2029 | 59.75 | | 11,562 | | 671 | (884) | - | 11,348 | 85,065 |
| 2030 | 60.75 | | | | | | - | - | 89,323 |
| 2031 | 61.75 | 21,527 | | | | | - | 21,527 | 67,965 |
| 2032 | 62.75 | 51,664 | | | | | (3,469) | 48,195 | 41,469 |
| 2033 | 63.75 | 51,664 | | | | | (3,428) | 48,236 | 41,602 |
| 2034 | 64.75 | 51,664 | | | | | (3,387) | 48,277 | 41,738 |
| 2035 | 65.75 | 51,664 | | | | | (3,345) | 48,319 | 41,875 |
| 2036 | 66.75 | 51,664 | | | | | (3,303) | 48,361 | 42,015 |
| 2037 | 67.75 | 51,664 | | | | | (3,259) | 48,405 | 42,155 |
| 2038 | 68.75 | 51,664 | | | | | (3,216) | 48,448 | 42,299 |
| 2039 | 69.75 | 51,664 | | | | | (3,171) | 48,493 | 42,443 |
| 2040 | 70.75 | 51,664 | | | | | (3,126) | 48,538 | 42,590 |
| 2041 | 71.75 | 51,664 | | | | | (3,081) | 48,583 | 42,604 |
| 2042 | 72.75 | 51,664 | | | | | (3,035) | 48,629 | 42,606 |
| 2043 | 73.75 | 51,664 | | | | | (2,988) | 48,676 | 42,607 |
| 2044 | 74.75 | 51,664 | | | | | (2,940) | 48,724 | 42,608 |
| 2045 | 75.75 | 51,664 | | | | | (2,892) | 48,772 | 42,610 |
| 2046 | 76.75 | 51,664 | | | | | (2,843) | 48,821 | 42,612 |
| 2047 | 77.75 | 51,664 | | | | | (2,793) | 48,871 | 42,615 |
| 2048 | 78.75 | 41,942 | | | | | (2,268) | 39,674 | 35,343 |
| | | | | | | | | | 1,842,602 |
| | | | | | | | | Present Value | 1,425,810 |

Dr. Shapiro Exhibit 10 - Corrected: Thomas Moran's Future Lost Compensation: Thomas Moran Works Until Age 62

| | | | | | Compensation in the Absence of Injury | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Age | Base Wages 2.50% | Extrn Wages 77.6% | Health Benefits | Metro North Pension | Tier I Contribution 6.20% | Tier II Contribution 4.90% | Medicare Contribution 1.45% | Additional Medicare Tax | Income Taxes | Net Compensation |
| 2019.95 | 50.70 | 4,699 | 3,647 | 749 | | - | - | (121) | | (1,767) | 7,206 |
| 2020 | 50.75 | 97,662 | 75,794 | 15,567 | | (8,537) | (5,013) | (2,515) | | (36,885) | 136,072 |
| 2021 | 51.75 | 100,104 | 77,689 | 15,957 | | (8,800) | (5,158) | (2,578) | | (37,992) | 139,222 |
| 2022 | 52.75 | 102,608 | 79,632 | 16,356 | | (9,071) | (5,308) | (2,642) | | (39,128) | 142,446 |
| 2023 | 53.75 | 105,174 | 81,624 | 16,765 | | (9,351) | (5,462) | (2,709) | | (40,295) | 145,746 |
| 2024 | 54.75 | 107,804 | 83,665 | 17,184 | | (9,639) | (5,620) | (2,709) | | (41,493) | 149,125 |
| 2025 | 55.75 | 110,500 | 85,757 | 17,614 | | (9,936) | (5,783) | (2,846) | | (42,724) | 152,583 |
| 2026 | 56.75 | 113,264 | 87,902 | 18,054 | | (10,242) | (5,951) | (2,917) | | (43,989) | 156,122 |
| 2027 | 57.75 | 116,096 | 90,100 | 18,506 | | (10,557) | (6,123) | (2,990) | | (45,286) | 159,746 |
| 2028 | 58.75 | 119,000 | 92,354 | 18,969 | | (10,883) | (6,301) | (3,065) | | (46,618) | 163,456 |
| 2029 | 59.75 | 121,976 | 94,663 | 19,443 | | (11,218) | (6,484) | (3,141) | | (47,987) | 167,253 |
| 2030 | 60.75 | 125,026 | 97,031 | 19,929 | | (11,563) | (6,672) | (3,220) | | (49,391) | 171,141 |
| 2031 | 61.75 | 32,302 | 25,069 | 5,149 | 89,335 | (3,557) | (2,811) | (832) | | (27,211) | 117,444 |
| 2032 | 62.75 | | | | 134,002 | | | | | (23,507) | 110,496 |
| 2033 | 63.75 | | | | 134,002 | | | | | (23,326) | 110,676 |
| 2034 | 64.75 | | | | 134,002 | | | | | (23,144) | 110,859 |
| 2035 | 65.75 | | | | 134,002 | | | | | (22,958) | 111,044 |
| 2036 | 66.75 | | | | 134,002 | | | | | (22,770) | 111,233 |
| 2037 | 67.75 | | | | 134,002 | | | | | (22,579) | 111,424 |
| 2038 | 68.75 | | | | 134,002 | | | | | (22,385) | 111,617 |
| 2039 | 69.75 | | | | 134,002 | | | | | (22,189) | 111,813 |
| 2040 | 70.75 | | | | 134,002 | | | | | (21,990) | 112,012 |
| 2041 | 71.75 | | | | 134,002 | | | | | (21,789) | 112,213 |
| 2042 | 72.75 | | | | 134,002 | | | | | (21,584) | 112,419 |
| 2043 | 73.75 | | | | 134,002 | | | | | (21,377) | 112,626 |
| 2044 | 74.75 | | | | 134,002 | | | | | (21,167) | 112,835 |
| 2045 | 75.75 | | | | 134,002 | | | | | (20,953) | 113,049 |
| 2046 | 76.75 | | | | 134,002 | | | | | (20,738) | 113,265 |
| 2047 | 77.75 | | | | 134,002 | | | | | (20,518) | 113,484 |
| 2048 | 78.75 | | | | 109,882 | | | | | (16,825) | 93,057 |

Dr. Shapiro Exhibit 10 - Corrected: (continued)

| Year | Age | | | | | | | |
|------|-----|----------------|-------------|------------------|---------------------|-----------------------------|----------------|-----------------|----------|
| | | Metro North Pension | Wages 2.52% | Health Benefits 2.52% | Retirement Benefits 5.80% | Social Security and Medicare | Income Taxes | Net Compensation | Net Loss |
| 2019.95 | 50.70 | | | | | | | - | 7,206 |
| 2020 | 50.75 | | 18,485 | 7,525 | 1,072 | (1,414) | - | 25,668 | 110,404 |
| 2021 | 51.75 | | 37,592 | 14,928 | 2,180 | (2,876) | (1,556) | 50,268 | 88,954 |
| 2022 | 52.75 | | 38,539 | 15,304 | 2,235 | (2,948) | (1,647) | 51,483 | 90,963 |
| 2023 | 53.75 | | 39,509 | 15,689 | 2,292 | (3,022) | (1,740) | 52,727 | 93,019 |
| 2024 | 54.75 | | 40,504 | 16,084 | 2,349 | (3,099) | (1,898) | 53,942 | 95,183 |
| 2025 | 55.75 | | 41,524 | 16,489 | 2,408 | (3,177) | (2,069) | 55,177 | 97,406 |
| 2026 | 56.75 | | 42,570 | 16,904 | 2,469 | (3,257) | (2,181) | 56,506 | 99,616 |
| 2027 | 57.75 | | 43,642 | 17,330 | 2,531 | (3,339) | (2,297) | 57,868 | 101,878 |
| 2028 | 58.75 | | 44,741 | 17,767 | 2,595 | (3,423) | (2,415) | 59,265 | 104,191 |
| 2029 | 59.75 | | 45,868 | 18,214 | 2,660 | (3,509) | (2,537) | 60,697 | 106,556 |
| 2030 | 60.75 | | 47,023 | 18,673 | 2,727 | (3,597) | (2,663) | 62,163 | 108,978 |
| 2031 | 61.75 | 21,527 | 12,151 | 4,825 | 705 | (930) | (1,109) | 37,169 | 80,275 |
| 2032 | 62.75 | 51,664 | | | | | (3,469) | 48,195 | 62,301 |
| 2033 | 63.75 | 51,664 | | | | | (3,428) | 48,236 | 62,440 |
| 2034 | 64.75 | 51,664 | | | | | (3,387) | 48,277 | 62,581 |
| 2035 | 65.75 | 51,664 | | | | | (3,345) | 48,319 | 62,726 |
| 2036 | 66.75 | 51,664 | | | | | (3,303) | 48,361 | 62,872 |
| 2037 | 67.75 | 51,664 | | | | | (3,259) | 48,405 | 63,019 |
| 2038 | 68.75 | 51,664 | | | | | (3,216) | 48,448 | 63,169 |
| 2039 | 69.75 | 51,664 | | | | | (3,171) | 48,493 | 63,319 |
| 2040 | 70.75 | 51,664 | | | | | (3,126) | 48,538 | 63,473 |
| 2041 | 71.75 | 51,664 | | | | | (3,081) | 48,583 | 63,630 |
| 2042 | 72.75 | 51,664 | | | | | (3,035) | 48,629 | 63,790 |
| 2043 | 73.75 | 51,664 | | | | | (2,988) | 48,676 | 63,950 |
| 2044 | 74.75 | 51,664 | | | | | (2,940) | 48,724 | 64,111 |
| 2045 | 75.75 | 51,664 | | | | | (2,892) | 48,772 | 64,277 |
| 2046 | 76.75 | 51,664 | | | | | (2,843) | 48,821 | 64,444 |
| 2047 | 77.75 | 51,664 | | | | | (2,793) | 48,871 | 64,613 |
| 2048 | 78.75 | 41,942 | | | | | (2,268) | 39,674 | 53,383 |
| | | | | | | | | | 2,252,726 |
| | | | | | | | | Present Value | 1,688,704 |



ANALYTICAL ECONOMICS ASSOCIATES

*Exhibit "A"*
*Curriculum Vitae*
*Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF*

Mailing Address: 89 Headquarters Plaza, #1208, Morristown NJ 07960
GPS: Headquarters Plaza, 43 Speedwell Avenue, North Tower, 12th Floor, Morristown, NJ 07960

## Education and Credentials
- Ph.D., Florida State University, Tallahassee, Economics, 1998
  Fields: Labor Economics; Industrial Organization and Regulation
- MAFF, National Association of Certified Valuators and Analysts, 2014
- CFE, Association of Certified Fraud Examiners, 2014
- Graduate Studies, Economics Institute, Boulder, CO
- B.S., Universidad Central de Venezuela, Caracas, Venezuela, 1990

## Professional Experience

**Analytical Economics Associates LLC, NJ**
President and Chief Economist – May 2016 to Present
Responsible for deliverables to clients and all aspects of economic and statistical analysis, research, economic damages calculations, preparation of economic expert reports, and expert testimony in State and Federal matters involving claims in:
  a) Labor and employment;
  b) Personal injury (including Life Care Plan projections);
  c) Wrongful death;
  d) Product liability;
  e) New York State CPLR §4545 Articles 50-A and 50-B application;
  f) Commercial damages modeling and analysis (such as breach of contract, business interruption, intellectual property disputes);
  g) Legal malpractice;
  h) Statistical and economic damages analysis in connection to anti-discrimination legislation;
  i) Executive compensation studies.

**Marks Paneth LLP; New York, NY**
Principal – Financial Advisory Services – January 2013 to April 2016
Director – Financial Advisory Services – January 2010 to December 2012
Manager – Financial Advisory Services – July 2007 to December 2009
Responsible for deliverables to clients and all aspects of economic and statistical analysis, research, economic damages calculations, preparation of economic expert reports, and expert testimony in State and Federal matters involving claims in:
  a) Labor and employment;
  b) Personal injury (including Life Care Plan projections) and wrongful death;
  c) Product liability;
  d) New York State CPLR §4545 Articles 50-A and 50-B application;
  e) Commercial damages modeling and analysis;
  f) Legal malpractice;
  g) Statistical and economic damages analysis in connection to anti-discrimination legislation;
  h) Executive compensation studies;

**JTA Economic Consulting, LLC; Morristown, NJ**
Projects:
- Research and analysis on the effects on competition in health care provision markets – 2007
- Economic Consulting Services for MPS/Zaumeyer Economic Consulting LLC
  An Affiliate of Marks Paneth & Shron LLP; New York, NY
  Independent Economic Consultant – March 2007 to June 2007
  - Economic analysis and research in matters related to (a) commercial litigation; (b) insurance claims including personal injury and wrongful death; (c) employment litigation matters such as wrongful termination, failure to promote and compensation differential claims; (d) Structured settlement analysis and computations under CPLR 50-A and 50-B regulations.

**Economatrix Research Associates, Inc.; New York, NY**
Senior Economist - January 2005 to May 2006
- Economic analysis, research and economic damages calculation in (a) pharmaceuticals commercial litigation; (b) business interruption litigation; (c) employment wrongful termination and failure to promote litigation; (d) personal injury litigation.
- Research and study specific industries as related to specific projects, including understanding the financial trends of the market and the specific companies.
- Research reliable sources of data and information, such as data and statistics and studies produced by Bureau of Economic Analysis, Department of Labor, Glass Lewis Associates, IMS Health, the American Hospital Association, Generic Pharmaceutical Association, among others.
- Review and understanding of scholarly articles related to case-specific issues.
- Review, analyze and critique opposing expert reports.
- Understanding the process by which specific companies prepare revenues forecasts.
- Prepare simulation analysis of revenue forecasts using Excel based upon case-specific assumptions.
- Prepare reports and other manuscripts as deliverables to clients as well as for internal use.
- Discuss research, methodology and findings with attorneys and clients in the process of delivering intermediate phase and final phase product.
- Analysis of income and benefits streams, including pension benefits analysis and calculations.

**ERS Group, Inc., Washington D.C. and Tallahassee, Florida**
Research Economist – September 1998 to May 2003
- Conducted economic and statistical analysis and research related to human resources policies and practices, prepared analyses, reports and expert opinion in employment litigation matters related to human resources decisions such as compensation, hiring, terminations, promotions, demotions, training, job channeling.
- Analyzed large computerized databases to evaluate integrity of information and to conduct statistical analyses.
- Wrote and reviewed computer programs in SAS, SPSS and STATA to conduct statistical analyses.
- Trained project participants in the use of SAS, SPSS and STATA.
- Responsible for projects involving economic and statistical analyses related to employment litigation, as well as analysis involving both auditing and monitoring of HR policies and practices, including OFCCP and Affirmative Action compliance analyses.
- Designed analysis and established model specifications in accordance to organizational structure and Human Resources policies and decisions.
- Managed projects involving the estimation of economic losses associated with employment litigation, as well as litigation involving exposure to hazardous materials.
- Interpreted analysis results and prepare draft reports.

- Conducted literature reviews relevant for project specific issues and prepare informative documentation on relevant issues in the current economics literature.
- Discussed with clients data characteristics, human resources and compensation policies and practices, preparation of databases for analysis and corresponding results.

## Teaching Experience in the United States and Abroad

Rutgers University Department of Public Administration, Ph.D. Program – Newark, New Jersey
Visiting Professor – Fall 2003 to Spring 2004
Course: Quantitative Methods I and II – (Ph.D. level research methods and econometrics course)

Florida State University - Department of Economics - Tallahassee, Florida
Teaching Assistant – Spring 1997 to Spring 1998
Courses:        Introduction to Economic Thinking
                Principles of Microeconomics
                Economics of Industrial Organization

Universidad Central de Venezuela, Department of Economics – Caracas, Venezuela
Instructor – January 1990 to August 1992
Courses:        Principles of Computer Science

## Professional Experience in Venezuela

**Central Budget Office (OCEPRE) – Caracas, Venezuela**
Advisor to the Chief Officer (Asesor del Jefe de Oficina) – April 1992 to September 1992
- *Modernization of the Public Administration*:
  Liaison between the office and the consulting group conducting statistical analyses to evaluate viability of the new Budget System. Processed, reviewed and provided data as well as other relevant information to the consulting group.
- *Technical Secretary* on behalf of OCEPRE to the "President's Committee for the Revision of Public Expenditure" ("Comision Presidencial Revisora del Gasto Publico"). Responsible for meetings logistics and the processing and provision of the information required by the Committee members.

**Central Planning and Coordination Office for the State** - Caracas, Venezuela
Oficina Central de Planificación y Coordinación del Estado (CORDIPLAN)
Advisor to the Director of Short-Term Planning – January 1991 to April 1992
(Asesor al Director de Corto Plazo)
- Assistant to the coordination of the Operating Plan for 1993 (Plan Operativo 1993) and Follow up Coordinator of the Operating Plan 1992 (Seguimiento del Plan Operativo 1992).
- Responsible for the Budget Follow up (PEC - Programa Economico Cuantificado) of 4 publicly owned, primary industry firms: SIDOR, VENALUM, Ferrominera del Orinoco and BAUXIVEN.
- Participated in the Committee for the Restructuring Plan of the Steel Plant (SIDOR). Project partially funded by the World Bank. In charge of the analysis and revision of the Auditing Systems of the plant.

---

<u>Publications</u>

"Lost Profits Damages: Court Standards, New v. Unestablished Businesses, and the Economist's Analysis" in *The Forecast*, National Association of Forensic Economics (NAFE), Volume 32, Issue 2, May 2018.

"Damages in Employment Disputes" in Stanley P. Stevenson and David A. McPherson *Determining Economic Damages*, Chapter 15, James Publishing, Revision 26, February 2018.

"Lost Profits: The Reasonable Certainty Standards and the Modern New Business Rule," *QuickRead,* NACVA, September 10, 2015.

"Lost Profits, Business Cycles, and the Reasonable Certainty Standard," *QuickRead,* NACVA, March 19, 2015.

"Presenting Compensation Estimates To A Jury," *The Metropolitan Corporate Counsel*, July/August, 2014.

"Before the Measurement of Lost Profits: Investigating the Business and the Market to "Isolate" the Source of a Decline," *The Metropolitan Corporate Counsel*, June 2013.

"An Introduction to the Operations of CPLR §4545 Article 50-A and Article 50-B: Statutory Computations from the Perspective of the Economic Expert," *The Basics of Trial Practice: After the Verdict*, New York State Bar Association, April 2013.

"At The Crossroads of Health Care Reform, Corporate Restructuring and Employment Litigation". *The Metropolitan Corporate Counsel*, Volume 20, No. 12, December 2012.

"Employee Benefits: Not All Are Created Equal". *The Metropolitan Corporate Counsel*, Volume 20, No. 7, July/August 2012.

"Compensatory Damages in Lost Wages Claims: The Relevance of Unemployment Trends Adjustments". *Employee Relations Law Journal,* Vol. 37, No. 4, Spring 2012.

"Damages in Labor and Employment Disputes: Designing the Economic Damages Model and the Role of the Expert". *The Metropolitan Corporate Counsel*, Volume 19, No. 11, November 2011.
"Models for Estimating Lost Wages May Be Incomplete". Interview with CCH, a Wolters Kluwer Company, *CCH Human Resources Management Ideas and Trends*, Issue No. 727, October 5, 2011.

"An Alternative Approach to a Critical Issue in Employment: Identifying and Correcting Potential Disparities in Employee Selections Before They Happen". *Employee Relations Law Journal,* Vol. 36, No. 3, Winter 2010.

"The Use of Attrition Rates for Economic Loss Calculations In Employment Discrimination Cases – A Case Study", with Paul F. White and Frederick M. Holt. *Journal of Forensic Economics*, Volume XVI, Number 2, Published September 2004.

"Reply to 'Comments on 'The Use of Attrition Rates for Economic Loss Calculations In Employment Discrimination Cases – A Case Study'"", with Paul F. White and Frederick M. Holt. *Journal of Forensic Economics*, Volume XVIII, Number 1.

<u>Other Publications</u>

"*The Forecast* Plays 20 Questions with Josefina Tranfa-Abboud" in *The Forecast*, National Association of Forensic Economics (NAFE), Volume 33, Issue 3, Summer 2018.

<u>Presentations</u>

Discussant for the paper titled "What do Women FEs Want – The Survey of NAFE Women Forensic Economists" by Nora Ostrofe. Eastern Region Conference of the National Association of Forensic Economics (NAFE) held during the Annual Eastern Economic Association Meetings - Boston, MA.

Discussant for the paper titled "Unretirement in the 2010s: Prevalence, Determinants, and Outomes" by Kevin Cahill. Southern Region Conference of the National Association of Forensic Economics (NAFE) held during the Annual Southern Economic Association Meetings – Ft. Lauderdale, FL.

Damages in Employment Disputes.  March 2018. Eastern Region Conference of the National Association of Forensic Economics (NAFE) held during the 44rd Annual Eastern Economic Association Meetings - Boston, MA.

Economic Damages, Economic Analysis, and Forensic Data Examinations.  February 2017.  Eastern Region Conference of the National Association of Forensic Economics (NAFE) held during the 43rd Annual Eastern Economic Association Meetings - New York, NY.

Panel Discussion:  Recent Developments in Defense Practice.  February 2016.  Eastern Region Conference of the National Association of Forensic Economics (NAFE) held during the 42nd Annual Eastern Economic Association Meetings – Washington D.C.

Economic Damages in Wrongful Death Claims: Legal Framework and Working with the Economic Damages Expert.  September 2015, Presentation with Gerard H. Hanson, Esq., Hill Wallack LLP – Presentation for the In-House Counsel Seminar, New Jersey Law Journal.

Damages in Employment Disputes: Analysis Before Calculations.  November 2014, Presentation to Day Pitney LLP.

Estimating Economic Damages in Personal Injury and Wrongful Death:  Analysis First, Projections Follow. November 2014, Presentation to the Law Office of Leon Kowalski.

Employment Litigation: The "Damages Only" Expert and Elements of Liability".  October 2014, Presentation with Paul F. Millus, Esq., Meyer Suozzi English & Klein, P.C. – Presentation for the Master the Practice CLE Seminar, New York Law Journal.

"Tax Liability of Awards and Settlements: Personal Injury and Wrongful Death".  December 2013, Presentation with Laura LaForgia, CPA, Marks Paneth LLP, New York, NY.

"Constructive Discharge:  Building the Case for Reasonable Economic Damages". October 2013, Webinar Presentation for the New York Law Journal, New York.  Presentation with Donna A. Napolitano, Esq. of Berkman, Henoch, Peterson, Peddy & Fenchel, P.C. of Garden City, New York and Thomas Anthony Ricotta, Esq. of White, Ricotta & Marks, P.C. of Jackson Heights, New York.

"The Affordable Care Act (ACA): Is Your 2014 Healthcare Strategy Compliant? Is Your HR Data Ready and Reliable?" May 2013, Marks Paneth & Shron LLP, New York, NY. Joint Seminar Presentation with Alan Hahn of Davis & Gilbert LLP, New York City.

"An Introduction to the Operations of CPLR §4545 Article 50-A and Article 50-B: Statutory Computations from the Perspective of the Economic Expert." CLE Program - April 2013, Presentation for the New York Bar Association, Long Island, New York.

"Commercial Damages: Central Analytical Issues and Relevant Information".  July 2012, Presentation for McElroy Deutsch Mulvaney & Carpenter LLP, Morristown, New Jersey.

"Strategic Options in Employee Relations". Marks Paneth & Shron LLP, Financial, Litigation, Accounting and Tax (F.L.A.T.) Seminar Series.  June 2012, Marks Paneth & Shron LLP, New York, NY.  Joint Seminar Presentation with Stephen F. Ruffino and Stephen J.O. Maltby of Gibney Anthony & Flaherty LLP.

"Lost Profits Disputes: Foundation for Reasonable Economic Damages".  NJ Law Journal's In-House Counsel Seminar, March 2012, Brooklake Country Club, Florham Park, New Jersey.  Presentation with Stuart M. Lederman, Esq., Riker, Danzig, Scherer, Hyland, Perretti, LLP.

## Other Speaking Engagements

"Financial Fitness - A Mid-Year Review". June 3, 2013. Financial Women's Association - New Jersey.

Panel speaker for the program "Navigating New Jersey's Small Business Economy, Thriving in Challenging Economic Times", Fairleigh Dickinson University, Rotham Institute of Innovation and Entrepreneurship. October 2019.

## Ph.D. Dissertation

"Structural Changes in the Norwegian Farm Sector: And Empirical Study of Worker Adjustment Costs to Leaving Agriculture".  Summer Semester 1998.

## Professional Associations and Memberships

National Association of Forensic Economics
American Academy of Economic and Financial Experts
National Association of Certified Valuators and Analysts
Association of Certified Forensic Examiners
Financial Women's Association

## Honors and Awards

- Merit Scholarship for graduate studies in Economics in the United States, granted by Fundacion Gran Mariscal de Ayacucho, Caracas, Venezuela 1992 – 1998.
- Nominated for "Outstanding Teaching Assistantship Award 1998", Economics Department, Florida State University, 1998.

<u>Volunteer and Community Work</u>

- Assumption of the BVM School regular volunteer.
- Newark Academy regular volunteer.
- Former Co-Chair and Mentor, FWA Mentoring Program for Stillman School of Business of Seton Hall University.


<u>Deposition and Trial Testimony</u>

| <u>Jurisdiction</u> | <u>Case Name</u> | <u>Appearance</u> |
| --- | --- | --- |
| American Arbitration Association October 2018 | Jose Hernandez v. NGM Insurance Company | Arbitration |
| Supreme Court of New York County of Bronx May 2018 | Alex Reyes and Alex Barcelona v. Eric J. Acevado, Chen Seng Tan and Little Richie Bus Service, Inc. | Trial |
| Supreme Court of New York County of Queens September 2016 | Alfred B. Boland and Linda Boland v. Courtesy Bus Co, Inc. and Manuel Sulca | Trial |
| Supreme Court of New York County of Kings September 2016 | Sammy Baum, an infant, by his father and natural guardian, Ari Baum, and Ari Baum, Individually v. Ziad A Milad and Marble Lite Inc. | Trial |
| Supreme Court of New York County of Nassau August 2016 | Frank Cristo and Mezza on the Green, Inc. v. The Incorporated Village of Lawrence, Martin Oliner, Joel A Mael, Michael A Fragin, David E. Smollett, and Leo McMahon | Mediation* |
| Supreme Court of New York County of Bronx January 2016 | Eugene Stolowski and Brigid Stolowski, et al. v. 234 East 178th Street LLC and The City of New York | Trial |
| Supreme Court of New York County of Kings November 2015 | Inna Grechko, Ind. and as Adm. of the Estate of Piotr Grinberg, Deceased, et al. v. Maimonides Medical Center, et al. | Trial |
| United States District Court Eastern District of New York June 2015 | Sally S. Neumann v. Wyandanch Union Free School District | Deposition |

| | | |
|---|---|---|
| Supreme Court of New York<br>County of Nassau<br>November 2014 | Nassau Regional Off-Track Betting<br>Corporation v. KRD Media, LLC<br>and Dot Digital Networks, Inc. | Trial |
| United States District Court<br>Eastern District of New York<br>May 2014 | Christopher Barrella v. Village of<br>Freeport and Andrew Hardwick as both<br>Mayor and in his individual capacity. | Trial |
| Supreme Court of New York<br>County of Queens<br>January 2014 | Monique Hines v. Angel A. Lopez,<br>Varsity Bus Co., Inc., Logistic Associates,<br>Inc., City of New York, et al. | Trial |
| United States District Court<br>Eastern District of New York<br>October 2013 | Wayne Chrebet v. County of Nassau,<br>Paul Szymanski, Bohdan Pilczak,<br>Scott Tusa, et al. | Deposition |
| United States District Court<br>Eastern District of New York<br>July 2013 | Willie Warren v. County of Nassau,<br>Nassau County Department of Public<br>Works, Thomas R. Suozzi, et al. | Trial |
| United States District Court<br>District of New Jersey<br>March 2013 | Federal Trade Commission v. Lane<br>Labs-USA, Inc., et al | Deposition |
| Supreme Court of New York<br>County of Kings<br>November 2012 | Bina Thakoordyal, as Administrator of the<br>Estate of Permaul Tulkanam v.<br>Varsity Bus Co. Inc. and Elliot A. Eustace | Trial |
| United States District Court<br>Eastern District of New York<br>October 2012 | Matthew Prince v. County of Nassau,<br>John Fitzgerald, Lieutenant, Nassau County<br>Police Department, 1st Precinct, et al. | Trial |
| Supreme Court of New York<br>County of Bronx<br>February 2011 | Eric Berrios v. 735 Avenue of the<br>Americas, LLC and Plaza Construction<br>Corporation | Trial |
| Supreme Court of New York<br>County of Queens<br>January 2011 | Robert Pattison and Kristin Murray v.<br>The City of New York, Keyspan Corp.,<br>Consolidated Edison Co. of NY et al. | Trial |
| Supreme Court of New York<br>County of Kings<br>November 2010 | Christopher Harrison v.<br>Maurice Andre Bailey, et al. | Trial |
| Superior Court of New Jersey<br>Sussex County: Law Division<br>April 2010 | Mary Ann Pearsall v.<br>Christopher Okechukwu, MD, et al. | Deposition |

Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF



89 Headquarters Plaza
GPS: Headquarters Plaza, 43 Speedwell Avenue
North Tower, 12th Floor
Morristown, NJ 07960

## STATEMENT OF COMPENSATION

*Re: Thomas M. Moran v. MTA Metro-North Railroad Company, et al.*

Analytical Economics Associates LLC (AEA) will be compensated for the professional services provided in connection with the above-referenced matter as follows:

- The portion of my time dedicated to all professional services provided in connection with my analysis in this matter, including, but not limited to, review of documents, analysis, research, discussions (internal and with counsel, report preparation, and testimony will be invoiced at the rate of $450 per hour.

- The billable rate of professional staff working under my supervision is in the range of $100 to $265 per hour.

- The fees for services rendered through the date of release of the Economist Expert Report of Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF dated March 9, 2020 have not yet been totaled, and will be invoiced a few days after the release of the report.

Respectfully submitted,

Josefina V. Tranfa-Abboud, Ph.D., CFE, MAFF
jtabboud@analyticaleconomics.com
Main:  973-975-4710 ext. 100
Direct: 973-590-2722