App'x 3

Lisa M. Rocchio, Ph.D.
1524 Atwood Avenue, Suite 222
Johnston, RI 02919
P: 401-751-5880
F: 401-751-5881

### Forensic Psychological Evaluation

**Name:** Thomas Moran
**Date of Birth:** 04/02/1969
**Date of Evaluation:** 12/06/2019
**Place of Evaluation:** Private psychology office of Lisa Rocchio, Ph.D.
**Date of Report:** 3/9/2020

### Introduction

Mr. Moran was referred for a comprehensive forensic psychological evaluation by his attorney, Steve Efron, Esq. Mr. Efron is representing the Metro-North Railroad Company (MTA) and the five named MTA police officers in the matter of *Thomas Moran, Plaintiff, VS. Metro-North Railroad, PO Nicholas Strype, PO Douglas Cohen, PO Luigi Seidita, PO Jason Nandoo, PO Joseph Teracciano, and PO Richard Doe, Defendants.*

Mr. Moran, an employee of Metro-North Railroad, has alleged psychological injury as a result of the circumstances surrounding his arrest by MTA officers on 08/04/2017, while he was working as a Conductor. I was asked to provide an opinion about Mr. Moran's current psychological state and the impact of any possible psychological disturbance on Mr. Moran's functioning and ability to return to his work as a conductor. Further, I was asked to provide an opinion regarding whether any current psychological disturbance can be attributed to the events surrounding his arrest.

### Informed Consent

Prior to the start of the evaluation, Mr. Moran was informed of the nature and purpose of the forensic evaluation. He was made aware of the limits of confidentiality and was told that the results of the evaluation would be provided to Mr. Efron and would then become part of the record of the Court. He was also told that I may be called to testify in court. Mr. Moran was made aware that his participation in this evaluation was completely voluntary, and that he could choose to end the evaluation at any time. It is my opinion that he understood the purpose of this evaluation, the limits to confidentiality, and my role. Mr. Moran gave written consent for participation in the evaluation and for the release of this information to Mr. Efron. He also gave written consent for me to speak with his wife, Norma Moran and his psychotherapist, Dr. Michael Bellotti as part of this evaluation.

### Evaluation Methods

Mr. Moran was evaluated at my office for a total of seven and one-half hours on 12/06/2019. Evaluation methods included a semi-structured psychosocial history interview, structured clinical interviews, and the administration of several psychological


PLAINTIFF'S
EXHIBIT
13
1:19-cv-03079-AT

tests, checklists and structured questionnaires. Additionally, in preparing this report, documents and other materials that were made available by Mr. Efron were reviewed.

## Additional Sources of Information

1. First Amended Complaint, dated 6/19/2019
2. Defendants' Rule 26 Initial Disclosure with attached Incident Reports of the MTA Police Department and witness statements
3. DVD recording containing visual security footage of the arrest
4. Deposition transcript of Thomas Moran, dated 10/2/2019
5. Deposition transcript of MJ Bellotti, Ph.D., LMFT, dated 11/27/2019
6. Deposition transcript of Douglas Cohen, dated 11/18/2019
7. Deposition transcript of Brian Hicks, dated 12/10/2019
8. Deposition transcript of Douglas Martin, dated 11/22/2019
9. Deposition transcript of Marina Zatman, MD, dated 12/12/2019
10. Psychiatric treatment records from Marina Zatman, MD, dated 9/12/2018 – 5/4/2019
11. Psychiatric treatment records from Alessandra Buonopane, MD, dated 8/30/2017 7/5/2018
12. Psychological treatment records from MJ Bellotti, Ph.D., LMFT from 7/15/2014 – 10/2/2014 and from 8/8/2017 – 9/17/2019
13. Letters from Michael J. Bellotti dated 6/17/2019 and 8/23/2019
14. Medical records from Bellevue Hospital dated 8/4/2017
15. Medical records from Connecticut Orthopaedic Specialists, dated 8/7/2017 – 8/13/2018
16. Medical records from Mark S. Kasper, MD, dated 8/7/2017 – 3/18/2019
17. Medical records from Nina Konstantinova, MD dated 8/1/2017 – 3/18/2019

19. Expert vocational report by Vocational Dynamics, LLC, dated 12/11/2019
20. Collateral telephone interview lasting 1.25 hours with Norma Moran on 3/3/2020
21. Collateral telephone interview lasting 0.5 hours with Dr. Michael Bellotti on 3/4/2020

## Psychological Tests and Structured Questionnaires

Psychosocial History Interview
Clinical Interview
Folstein Mini Mental Status Exam-2
Personality Assessment Inventory (PAI)
Miller Forensic Assessment of Symptoms (M-Fast)
Trauma Symptom Inventory-2 (TSI-2)
Trauma Attachment Belief Scale (TABS)
Adverse Childhood Experience (ACE) Questionnaire
Life Events Checklist (LEC)
Posttraumatic Checklist 5 (PCL 5)
Beck Depression Inventory 2 (BDI 2)
Beck Anxiety Inventory (BAI)

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

Mood Disorders Questionnaire (MDQ)
World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0)
Clinician Administered PTSD Scale for DSM-5, Past Month Version

## Relevant History Prior to the Incident
*Childhood and Family History*
Mr. Moran is a 50-year-old man of English and Irish descent. He was raised by his parents, and is the youngest of four sons. His brothers are now ages 54, 59, and 60, and are all living in Connecticut. He described himself as close with his brothers, and as closest with his next oldest brother. His father, now age eighty-two, is a former marine who later worked as a yellow-pages salesman. Mr. Moran's mother, also age eighty-two, is a retired court secretary. Mr. Moran stated that as far as he knows, he met all developmental milestones within expected time limits, and he did not recall having any developmental or learning challenges as a child. He did report having meningitis as a three or four-year-old, but did not experience any lasting difficulties as a result. Mr. Moran described his family as "very tight" and stated that his immediate family and extended family are very close. Mr. Moran noted that he was raised within the Catholic faith, and that his family attended church together on a weekly basis. He reported that his faith and involvement with the church remain a very important part of his life.

*Educational History*
Mr. Moran reported that he attended public elementary school and Catholic schools for middle school and high school. He graduated from Notre Dame High School in West Haven, Connecticut in 1988. After high school, he attended Nichols College in Dudley MA for one semester, and Manchester Community College in CT for approximately one year. He then attended Southern Connecticut State University for two semesters, completing a total of approximately three years of college before leaving school in 1993. Mr. Moran noted that he initially began taking business classes in college, but later changed his major to physical education. However, he ultimately decided that "school wasn't for me," and left college to enter the workforce.

Overall, Mr. Moran described himself as an average student, and although he did not receive special services or tutoring during his school years, he stated that the had to work hard in school as academics did not come easily to him. He denied ever being suspended from school or getting into trouble. He described his love of basketball throughout high school, and noted that he made friends easily and got along well with others.

*Occupational History*
Mr. Moran reported that during college he worked part-time doing odd jobs such as painting and working for a moving company. He stated that he began working as a copier salesperson after leaving college in 1994. He remained in this line of work, though with three separate companies, until 1999, when he worked for approximately six months selling yellow-pages. He began working as a coach cleaner for Metro-North Railroad in April, 2000, was promoted to the position of tower operator in November, 2000, and worked in that position until becoming a Conductor in June, 2002. He worked as a

3

Conductor for the Metro-North Railroad until his arrest on August 4, 2017, and has been out of work since that time.

Mr. Moran reported that while he was successful in his work as a copier salesperson, he always wanted to work on the trains. He described his progression from coach cleaner to conductor with great pride, stated that he loved his job, and that it had been his "dream job." He emphasized how hard he worked, and stated that he had given up holidays and family time in order to earn a living and provide for his family. He indicated that he was dedicated to his job and to his role as the primary financial provider for his family. He reported, and his wife confirmed, that he generally worked six days per week.

During a collateral interview, Ms. Moran stated that her father and brother also work for the railroad. She confirmed that working for the railroad had been a goal of Mr. Moran's for a very long time. She stated that when working, Mr. Moran would often come home and talk about how much he loved his job and how much he enjoyed having the opportunity to interact with travelers and coworkers on a daily basis. In addition, both Mr. and Ms. Moran described his sense of accomplishment at being able to earn enough of an income to support his family in a manner that allowed Ms. Moran to remain in the home working as a homemaker and caregiver for their children.

*Psychosocial History*
Mr. Moran reported that he has been married to his wife for twenty-five years. They have one son, aged twenty-three, and three daughters ages seventeen, nineteen, and twenty-one. Mr. Moran and his wife both reported that their son has had significant learning disabilities, as well as an expressive language and processing disorder and executive functioning difficulties since childhood. In addition, they indicated that he was diagnosed with a benign tumor in his lower back in 2016 that required surgical removal due to its dangerous location. Ms. Moran reported that following the surgery, her son required daily radiation and has needed MRI follow-up every three months since that time. Although his health is now stable, and he recently successfully completed his college degree, his medical difficulties were identified as a significant source of stress and concern by both Mr. and Ms. Moran. They both reported that they attended some family therapy sessions with Dr. Bellotti when their son was an adolescent for assistance coping with stress. Dr. Bellotti indicated during a collateral interview that the family therapy sessions were few in number, and that he family generally coped very well. He reported that although Mr. Moran was experiencing some anxiety at that time in his life, there were no indications of impaired functioning or major psychological difficulties. Dr. Bellotti's verbal reports were also consistent with information contained in his treatment notes.

Mr. Moran's twenty-one-year-old daughter is a senior at Merrimac College in MA, and his nineteen-year-old daughter is in her first year at Assumption College in MA. Both daughters are reported to be receiving psychotherapy for anxiety and stress that their parents reported is related to their father's arrest. The elder daughter in particular, who attended court with her mother on the day of her father's arrest, was described by both Mr. and Ms. Moran as being highly anxious and worried about her father. Mr. Moran's

4

seventeen-year-old daughter is currently a junior in high school and lives at home. Mr. Moran described her as having social and learning difficulties as well as processing delays dating back to childhood. He and Ms. Moran also reported that their youngest daughter has been very anxious and worried about her father since the incident in August, 2017.

When asked about his social life and interactions with others, Mr. Moran described himself as "easy going and outgoing," and as someone who gets along well with others and who makes friends easily. He reported that he previously enjoyed helping others, interacting in social situations, and making conversation. He reported having close friendships and social support from his priest and extended family. Mr. Moran's descriptions of his sociability and temperament were consistent with his wife's descriptions of his personality and behavior prior to the incident in August, 2017. Ms. Moran described her husband as extremely social and as someone who looked forward to social and family gatherings. For example, she noted that he had been involved with volunteer work with a community organization that provides assistance to disabled children, and has also volunteered at his church regularly.

*Legal History*
Mr. Moran denied experiencing any legal difficulties prior to the incident on August 4, 2017.

*Medical, Psychiatric, and Substance Abuse History*
*Substance Abuse*
Mr. Moran stated that he had meningitis as a three-to-four-year old child. He also reported having jaw surgery and orthodontic work during his senior year of high school. He indicated that he was diagnosed with and began treatment for hypothyroidism approximately fifteen years ago, and has been diagnosed with and treated for elevated cholesterol and triglyceride levels for approximately twenty years. He also indicated that he was diagnosed with sleep apnea approximately three years ago, and now sleeps with a CPAP machine.

Mr. Moran denied a history of significant psychological difficulties or treatment. He reported that he attended a few family and individual psychotherapy sessions several years ago, but stated that he did not believe that he has ever experienced a significant decline in functioning prior to his arrest. His characterization of the previous family and individual psychotherapy with Dr. Bellotti was consistent with Dr. Bellotti's psychotherapy notes and with Dr. Bellotti's and Ms. Moran's verbal reports during collateral interviews.

Psychotherapy notes from Dr. Michael Bellotti, dated 7/15/2014 – 10/2/2014
Medical records indicate that Mr. Moran saw Dr. Bellotti for six sessions to deal with anxiety related to a work-related issue. In a session on 7/17/2014, Mr. Moran is noted to describe himself as "always worrying about the consequences of his actions," and as

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

currently worrying about doing something wrong and needing to "follow the rules." At that time, Mr. Moran was experiencing physical symptoms of anxiety as well as sleep and appetite disturbance. By the conclusion of treatment on 10/2/2014, Mr. Moran was reported to be doing well and was described as "happy and relaxed."

Mr. Moran also indicated that he has never had a problem with substance use in the past, and that he did not consume alcohol

## Relevant History During the Time of the Incident
*Plaintiff's report of the incident*
Mr. Moran stated that in the early morning hours of August 4, 2017, in the course of readying the train, he encountered a man in a wheelchair and asked him where he was going. The man reportedly told Mr. Moran that he was planning to get off at the Harlem 125th St. station. Mr. Moran reportedly told this man that this train did not permit passengers to de-board at that station as it was a "pick up only stop." He said that he told the man that he would bring him to the appropriate train once he finished his duties. Mr. Moran stated that the customer was intoxicated and speaking abruptly, and that instead of waiting as requested, he moved away and boarded the train at another door while Mr. Moran was otherwise occupied. Mr. Moran described approaching the passenger in the wheelchair, who was then on the train, and asking him to get off of the train so that Mr. Moran could bring him to the proper train. Mr. Moran stated that the passenger became angry and began yelling, cursing, and refusing to move. The man reportedly told Mr. Moran that he had a ticket and "you are not going to stop me." Mr. Moran indicated that he did not want a problem with the passenger, and did not feel that it would be appropriate to allow him to remain on the train. Mr. Moran explained to me that since the train was not supposed to allow passengers to de-board at the Harlem station, he was concerned that there would not be appropriate personnel at that stop to assist a passenger in a wheelchair. He also emphasized that he did not believe he had the authority to allow a passenger to travel once he knew that he planned get off at a "pick-up only" stop. He said that he was responsible for escorting and assisting all passengers in wheelchairs, and that he would have needed the permission of the trainmaster to allow the man to travel due to risk of liability if the man was injured getting off the train.

Mr. Moran said that after the passenger began yelling and cursing, he walked away and asked the MTA officers for assistance. He reported that they told him the passenger had a ticket and that he should transport the passenger, and then ignored him. Mr. Moran said he then returned to the passenger, and he and the train engineer attempted unsuccessfully to explain to the passenger that he was on the wrong train. Mr. Moran also told me that the engineer told him that he had overheard the police officers say that they were not going to help Mr. Moran remove the passenger.

Mr. Moran then described going to the trainmaster's office. He said that when he walked into the office, an MTA police officer was already in there telling the trainmaster (Douglas Martin) that Mr. Moran had refused to transport a ticketed passenger. Mr. Moran stated that he was angry and upset, and that he told Mr. Martin that he was not

6

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

going to take that passenger. The MTA officer then reportedly asked Mr. Moran for his name and Mr. Moran told the officer he did not have to provide his name and walked out of the office.

Mr. Moran said that when he left Mr. Martin's office, he fully expected that Mr. Martin would follow him back to the train to speak with the passenger and assess the situation. Mr. Martin's deposition testimony confirmed that this would have been typical procedure, and that was what Mr. Martin had intended to do once Mr. Moran left his office. Mr. Moran described walking back toward the area of the train where the passenger had boarded and said that he was followed by three officers. He reported that at first, he thought the officers were coming to help him to remove the passenger, but that two other officers then began yelling. He stated that he then pointed to the trainmaster and to the location of the passenger and then turned to walk toward the train. He described being hit from behind and pushed to the ground. Mr. Moran stated that while he was lying on the ground, one officer had his knee on his back and another had a barking dog near his face. He described being surrounded and then handcuffed. He said that he repeatedly asked what he was doing wrong, and that the officers yelled at him and told him to shut his mouth. He also described begin taunted and told "we've got you, you're in trouble, and no one's going to help you."

Mr. Moran's descriptions of his arrest were largely consistent with the circumstances depicted in video security footage of the incident. However, the video footage did not contain an audio recording, so it was not possible to determine what was said by either Mr. Moran or the officers. In addition, although Mr. Moran reported to me that an officer placed his knee on his back once he was taken to the ground, it was not possible to determine the exact positioning of the officers in the video footage, as they were standing in front of Mr. Moran as he was on the ground.

Mr. Moran told me that he was then brought to the holding cell in the terminal, and that he initially thought that someone from management would come down and help him to figure out what was happening. He reported feeling shame and humiliation as well as confusion when the officers removed his belt, shoelaces, and conductor shirt.

Mr. Moran said that his back was hurting him from having been forcibly brought to the ground, and that he did not feel well. He reportedly repeatedly requested medical assistance due to his pain and discomfort. He also stated that he felt weak and confused as well as nauseated. He remained handcuffed and was brought out of the terminal via the Lexington exit and transported to Bellevue hospital via ambulance. He reported that the paramedics were "rude." At Bellevue hospital, Mr. Moran reported experiencing further shame and humiliation when he was not permitted to use the bathroom in a timely manner and urinated in his pants. He was eventually assessed and treated, and was diagnosed with a back strain. His reports of medical care at Bellevue were confirmed by review of his medical records.

7

Forensic evaluation report of Thomas Moran<br>By Lisa M. Rocchio, Ph.D.<br>03/09/2020

After leaving Bellevue, Mr. Moran was again handcuffed, placed in a police car, and transported to Grand Central Terminal to complete the booking process. He stated that at that time it was around 4:30 in the morning, and he did not know what the charges were. He reported that he was allowed to call his wife and was transported to Manhattan to await arraignment.

Mr. Moran described feeling frightened and confused when he was brought into the Manhattan holding area beneath the criminal courthouse. He said that there were three cells with each cell holding about 16 men. He reported that the other detainees teased him because he was crying, and that he was threatened with sexual violence. He reported that one of the men told him "you better be careful if you are here when the lights go out," and stated that he saw men openly smoking drugs, which he believed to be crack cocaine. He indicated that because the men were openly using drugs and threatening him, he feared that if he were attacked, he would not be protected. In addition, he was aware that it was 9:40pm and fearful that he would not be brought to court before it closed at 10:00pm, and would be forced to spend the night in the cell with the other men.

Mr. Moran was able call his wife on the telephone, and stated that she told him that he was being charged with assaulting a police officer. He was eventually brought up to court and released to his wife and daughter Shannon, who had accompanied his wife to court. He and his wife and daughter returned to the police station\\ at the terminal to collect his belongings, and then went to the Yale-New Haven Hospital. He reportedly then went home for a few hours and then went back to the hospital and requested that he speak with a mental health specialist who gave him sleep medication and encouraged him to contact Dr. Bellotti as soon as possible. Mr. Moran stated that he was able to see Dr. Bellotti within a few days. Ms. Moran confirmed Mr. Moran's reports of speaking with him on the telephone and picking him up at the courthouse. She also stated that they went from the terminal directly to Yale-New-Haven hospital and that Mr. Moran was "a mess" at the time.

Mr. Moran described feeling hurt, angry and betrayed by his experiences. He repeatedly emphasized that he had done nothing wrong and that he had been following the rules and doing what he was supposed to do as a conductor. He reported that he felt ashamed and humiliated by his arrest and by having to go to court three times before the charges were eventually dismissed six months later in February, 2018. He indicated that he was an innocent man who would never hurt another person and said that he felt "they ruined my life."

In the months following the incident, Mr. Moran reported that he attended twice weekly psychotherapy with Dr. Bellotti and attempted to do prescribed exposure activities that included riding on the train and going into Grand Central Terminal. He stated that he was depressed and experiencing significant symptoms of posttraumatic stress such as intrusive recollections and upsetting dreams of the arrest, avoidance of reminders, social isolation, low energy, and intense anxiety about the financial and psychological strain his unemployment was placing on his wife and children. He stated that he was unable to

attend family or social functions due to fear of being asked about what had happened, and reported that he was frequently tearful and emotional when reminded of the incident.

Mr. Moran reported that after approximately six months, his symptoms improved to the point where his functioning at home improved and he reduced the frequency of therapy appointments to once weekly.

*Official reports of the incident*
MTA incident report from Officer Nicholas Strype, dated 8/15/2017
Officer Strype's report indicated that on August 4, 2017, MTA officers were approached by a conductor (Thomas Moran) and asked to remove a handicapped customer in a wheelchair. The report stated that the conductor was yelling at the officers and refusing to transport a passenger who had a valid ticket. The report described Mr. Moran as agitated and using profanity, and stated that "the conductor was behaving in a disorderly and unprofessional manner." Mr. Moran was reported to have refused to provide the officers with his name and man number, and was quoted as saying "fuck you I don't have to give you shit, and I'm not taking the guy in the wheelchair." Officer Strype's report further stated that when one of the officers (Officer Seidita) was in Douglas Martin's office, the Operations Manager's office, Mr. Moran "slammed the door open in an aggressive and violent manner, pointing his finger at Officer Seidita and calling him a piece of shit...." Officer Strype reported that after leaving Mr. Martin's office, Mr. Moran "became irate toward the officers on the platform screaming, cursing, and stating that the officers are useless..." Mr. Moran's behavior was described as "causing public alarm," and the officers reportedly attempted to place Mr. Moran in handcuffs when he began to walk away. Mr. Moran was described as resisting arrest and was "physically directed to the ground and placed in handcuffs." Officer Strype indicated that Mr. Moran "intentionally shoulder checked" the officers multiple times while being escorted by the officers. The report indicated that as a result of Mr. Moran's behavior, Officer Cohen experienced an injury to his right shoulder.

Officer Strype's report also stated that Mr. Moran complained of "full body injury" and was escorted to Bellevue Hospital via ambulance.

Incident description from Douglas Martin – Trainmaster, dated 8/23/2017
Mr. Martin's report indicated that he had interviewed the Engineer who had witnessed Mr. Moran's interactions with the passenger in the wheelchair. Mr. Martin stated that Mr. Moran had told the passenger in the wheelchair that he would be unable to de-board the train at the 125th St. stop, and that he would escort the passenger to the appropriate train. Mr. Martin reported that the passenger cursed at Mr. Moran and wheeled himself onto the train, and that Mr. Moran had subsequently requested assistance from the police officers. He also indicated that Mr. Moran had come to his office where he was speaking with an officer, and told him he "wasn't taking the passenger no matter what the cops say," and that he had refused to provide his name and man number to the officer when asked. Mr. Martin stated that while he was in his office giving the officer information, he heard yelling and came out to see a group of officers and Mr. Moran in handcuffs. He was told

9

that Mr. Moran was under arrest, but was not told what the charges were when asked. Mr. Martin said that he was later informed that Mr. Moran was brought to Bellevue hospital complaining in pain in his ankle and head.

Statement from Brian Hicks, Deputy General Station Master, dated 8/4/2017
Mr. Hicks reported that on August 4, 2017, he was approached by an MTA police officer who asked him if a conductor could refuse to transport a customer with a valid ticket. Mr. Hicks reported that he told the officer that he was not in charge of conductors and took the officer to speak with Trainmaster Doug Martin. Mr. Hicks reported that when he brought the officer to Mr. Martin's office, he heard Mr. Moran yelling that "no way am I taking this guy, I don't care what they say." He also noted that he heard the officer ask Mr. Moran for identification, and that Mr. Moran refused to provide the information and then said "you guys are useless" before walking out of the office.

Statement from Antonio Athride, passenger in wheelchair, regarding his interactions with Mr. Moran
Mr. Athride provided a verbal statement that was documented in writing by Officer Haber. He stated that Mr. Moran had told him that the train did not drop off in Harlem. He also stated that the conductor "pulled me by the handles of the wheelchair off of the train," and that he was then pulled back onto the train by other passengers once Mr. Moran had walked away. Mr. Athride stated he had no other physical interaction with Mr. Moran, and that he had been told by the MTA police that the train would allow him to stop and de-board at the Harlem 125th station.

*Review of video recording of the incident*
Security video footage of the incident was largely consistent with Mr. Moran's reports of walking toward the train and being approached from behind by MTA officers. The video recording depicts Mr. Moran being approached by a group of three officers. He was then seen being forcibly brought to the ground by an officer. The group of three officers were then approached by two additional officers, one of whom was holding a large dog on a leash. The video showed several officers, one of whom was holding a dog on a leash, surrounding Mr. Moran as he was lying face down on the ground and being handcuffed.

The officers were surrounding Mr. Moran and standing in front of him, so it was not possible to determine the exact position of the officer who place the handcuffs on Mr. Moran. In addition, the security footage did not contain audio recordings, so it was not possible to hear what was being said. Video footage from other locations in the terminal depict Mr. Moran in handcuffs being escorted by the officers and the leashed dog to another location in the terminal.

*Review of relevant medical records*
Bellevue Hospital Records, dated 8/4/2017
Records from the Bellevue Hospital indicated that Mr. Moran was evaluated and treated in their Emergency Department on 8/4/2017. He reported pain in his back, shoulder, and jaw after being "tackled" by the police, and rated his pain a 7 on a 10-point scale. He had

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D
03/09/2020

a normal CT scan and was given hydrocodone at the hospital and instructed to take Ibuprofen at home following discharge.

Connecticut Orthopeadic Specialists treatment notes, dated 8/7/2017 – 8/13/2018
Mr. Moran was initially seen on 8/7/2017 following the incident on 8/4/2017. He complained of pain, stiffness, and limited range of motion in his lumbar region and shoulders. He was diagnosed by HM Bradburn, MD with multiple contusions, lumbar strain, and contusions of his pelvis. He was instructed to follow up with his primary care physician, Dr. Kramer, and to continue treating his pain with Ibuprofen. Past medical history documented in this treatment note included Depression, Sleep Apnea, and Thyroid Disorder. A note dated 8/9/2017 indicated that Mr. Moran was referred for physical therapy. Subsequent follow up treatment notes document steady improvement, and Mr. Moran was released from treatment on 8/13/2018 with "minimal residual symptoms" and was instructed to follow up as needed.

Mark Kasper, MD treatment notes, dated 8/7/2017 – 3/13/2019
Mr. Moran presented for treatment with Dr. Kasper on 8/7/2017 and 8/14/2017 with reports of anxiety and back pain related to the events of August 4, 2017. Dr. Kasper diagnosed Mr. Moran with an adjustment disorder and a back injury, and recommended he follow up with Dr. Bellotti. Mr. Moran continued to follow up with Dr. Kasper regularly for general medical care, and Dr. Kasper provided treatment for his hyperlipidemia, hyperglycemia, and thyroid conditions, and monitored his reported symptoms of anxiety and depression and treatment for same by Dr. Bellotti and Dr. Buonopane. In a treatment note dated 3/13/2019, Dr. Kasper noted that Mr. Moran was administered the PHQ-9, a screening instrument for depressive symptoms, and scored a 0, denying all symptoms of depression.

Alessandra Buonopane, MD treatment notes, dated 8/30/2017 – 7/5/2018
Dr. Buonopane initial treatment note on 8/30/2017 indicated that Mr. Moran presented with symptoms of posttraumatic stress, panic, and generalized anxiety following the events on August 4, 2017. She also noted a reported history of major depressive disorder. Dr. Buonopane diagnosed Mr. Moran with Posttraumatic Stress Disorder and Generalized Anxiety Disorder, prescribed Lexapro, 20mg, and Ativan, 1mg. Subsequent treatment notes documented that over the course of treatment, Mr. Moran's symptoms improved somewhat, but that he continued to have difficulties with avoidance of trains and Grand Central Terminal as well as symptoms of intrusion related to his arrest and experiences while detained. For example, her treatment note dated 4/4/2018 stated that Mr. Moran was continuing to report flashbacks and was experiencing depressed mood in response. She also indicated that he was reporting increased energy and a clearer mind, and increased engagement in family activities.

Marina Zatman, MD treatment notes, dated 9/12/2018 – 5/14/2019
Mr. Moran transferred psychiatric care from Dr. Buonopane to Dr. Zatman following Dr. Buonopane's closing of her practice. Dr. Zatman's treatment notes indicated that she diagnosed Mr. Moran with Posttraumatic Stress Disorder and continued to prescribe his

11

psychiatric medications, which included Lexapro, Propranolol, Seroquel, and Ativan. Subsequent treatment indicated improvements in mood but also noted variable sleep difficulties, variable energy levels, and continued flashbacks. For example, a note dated 12/5/2018 stated that Mr. Moran was experiencing flashbacks and was "anxious and depressed at times, thinking a lot about the situation. A note dated 4/17/2019 similarly described Mr. Moran as depressed and anxious, and concerned about his finances.

Dr. Michael Bellotti psychotherapy treatment notes, dated 8/8/2017 – 9/17/2019
Following the incident, Mr. Moran presented for treatment on 8/8/2017. Dr. Bellotti's notes indicate that Mr. Moran's description of the incident was consistent with Mr. Moran's current reports. Mr. Moran presented with symptoms of physical pain, headaches, anxiety, racing heart, impaired sleep, confusion, and intrusive thoughts and memories of the arrest and jail, and depressed mood. He was diagnosed with Posttraumatic Stress Disorder. Mr. Moran was seen approximately twice weekly for a period of about six months, at which time sessions decreased to weekly appointments. Dr. Bellotti noted on 8/9/2017 that Mr. Moran had a BDI-2 score of 27 and a BAI score of 59, indicating moderate levels of depression and severe levels of anxiety.

Dr. Bellotti's notes described Mr. Moran as anxious and as wanting to return to work. For example, a treatment note dated 8/30/2017 indicated that Mr. Moran was worried about legal charges and "also worries about getting back to work, does not feel he is ready yet, but is anxious to return to work. He tells me he likes his job and wants to return to work once he is physically and emotionally healthy again." Mr. Moran was described as experiencing significant symptoms of posttraumatic stress that impaired his functioning. For example, in a note dated 9/12/2017 Mr. Moran was described as being "traumatized by what they did to me that day," and he reported having flashbacks and increased anxiety.

Dr. Bellotti's treatment approach utilized cognitive-behavioral therapy and included exposure exercises to train travel and communication with colleagues. For example, a note dated 11/29/2017 indicated that Mr. Moran had agreed to "2-3 exposures to train this week and talking to colleagues. Talked about future expansion of trip lengths."

Overall, Dr. Bellotti's notes indicated that Mr. Moran responded well to treatment. He was frequently described as helping neighbors and attending school functions for his daughter. Updated BAI and BDI-2 screening measures administered on 9/20/2017 indicated that Mr. Moran's BAI score was a 14 and his BDI-2 score was 14, indicating mild levels of depression and anxiety.

In a note dated 9/19/2018, Dr. Bellotti noted that Mr. Moran "kept very busy with volunteer work: dog walking for neighbors, Best Buddies outing, and daughter's cross-country team meet.
       Dr. Bellotti noted "cont'd nightmares related to incident and lack of RR support." Over time, Mr. Moran's functioning continued to improve and he was described on 1/3/2018 as having "done well with desentization (sic) riding trains." In a

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

note dated 2/6/2019, Dr. Bellotti indicated that "Tom wants to return to work with the RR and is not looking for another job." However, in that same note, Dr. Bellotti also noted that Mr. Moran was continuing to experience flashbacks involving the arrest and his time in jail as well as feelings of lack of support from the MTA police and his supervisor.

A letter from Dr. Bellotti dated 6/17/2019 indicated that Mr. Moran was continuing to experience symptoms of posttraumatic stress that limited his functioning and that he was unable to perform exposure exercises due to his feelings of anger, resentment, and anxiety. It was Dr. Bellotti's opinion at that time that Mr. Moran was "completely and totally disabled" from work involving MTA or the trains. Dr. Bellotti's treatment notes on 8/13/2019 and 8/20/2019 indicated that Mr. Moran continued to experience difficulty completing exposure exercises at the railroad due to elevated anxiety and pain as well as anger and flashbacks of the incident. Dr. Bellotti also wrote that they also discussed the possibility that Mr. Moran would be unable to return to the railroad for employment.

*Review of transcripts of deposition testimony*
The transcripts of deposition testimony given by Thomas Moran, Brian Hicks, Douglas Martin, Officer Douglas Cohen, Dr. Bellotti, Dr. Zatman were reviewed.

Mr. Moran's deposition testimony was largely consistent with his reports during this evaluation and the reports he made to treatment providers that were documented in his medical records. Dr. Zatman's deposition testimony was consistent with the information previously described and contained in her treatment notes. Dr. Bellotti's deposition testimony was largely consistent with the information in his psychotherapy treatment notes and with information he verbally provided during collateral interview.

The deposition testimony provided by Trainmaster Douglas Martin, and Deputy General Station Master Brian Hicks was largely consistent with the information previously described and contained in their written incident reports.

In his testimony, Mr. Hicks recounted being asked by the police officers if a conductor was permitted to refuse to transport a ticketed passenger. He described bringing the officer to Mr. Martin's office, and observing a "heated exchange" between Mr. Moran and the Officer Seidita. He was unable to specifically recall whether foul language was used, but did recall that Mr. Moran was angry and upset.

Mr. Martin testified in deposition that the incident report he wrote regarding the incident was accurate. He also stated that although Mr. Moran was loud and angry, he could not recall whether Mr. Moran had used curse words toward Officer Seidita during the interactions in his office.

Officer Cohen indicated in his deposition testimony that he was unaware of any history of conflict between MTA officers and the Conductors. He also stated that on the day of his arrest, he witnessed Mr. Moran yelling, cursing, and screaming at the MTA officers. He stated that he told Mr. Moran to lower his voice, and that Mr. Moran replied by saying "I

13

don't have to fucking listen to you." He reported that he asked Mr. Moran for identification multiple times, but that Mr. Moran refused. He further indicated that he found Mr. Moran's behavior to be unprofessional and that it was creating a public disturbance, which was why he wanted Mr. Moran's identifying information. He stated that Mr. Moran engaged in both disorderly conduct and resisting arrest when he attempted to place Mr. Moran in handcuffs. Officer Cohen described Mr. Moran as having to be brought to the ground by several officers in order to be restrained. He also said that in the course of arresting Mr. Moran, he injured his shoulder, which led to the charge of assaulting a police officer.

## Current Status
### Current Medications
On the day of the evaluation, Mr. Moran reported that he was taking the following medications:

1. Lovaza, 1 capsule, twice daily, for elevated cholesterol
2. Simvastatin, 40mg per day for elevated cholesterol
3. Levothyroxine, 125mg per day for hyperthyroidism
4. Aspirin, 81mg per day, for heart health
5. Ativan, 1mg, twice daily, for anxiety
6. Lexapro, 20mg per day, for depression and anxiety
7. Propranolol, 20mg, three times daily, for anxiety
8. Quetiapine, 25mg at bedtime, for sleep and anxiety

### Current Substance Use
Mr. Moran reported that he does not use recreational drugs and stated that his alcohol use is minimal due to his current medications.

### Mental Status and Behavioral Observations
Thomas Moran is 50-year-old European-American man. He was well-groomed and neatly, though casually dressed for our meeting. Mr. Moran was polite and cooperative with all phases of the evaluation process, and though he appeared to be extremely anxious at the beginning of the evaluation, he became slightly more relaxed as the evaluation progressed. Mr. Moran was fully oriented to person, time and place. He correctly identified himself and the date and location of the evaluation, and had no difficulty carrying out directions to do things that were asked of him. He consistently appeared to be making his best effort to respond to my questions and asked questions of me as was appropriate. His speech was simple and logical, and easy to understand; however, at times Mr. Moran exhibited difficulties with elaborating on his responses and he demonstrated limited insight. There was no evidence of thought disorder or confusion, and auditory, visual, and olfactory hallucinations and unusual perceptions were denied (i.e., he denied any experiences of seeing, hearing, or feeling things in the absence of external stimuli.) His range of affect was somewhat constricted, and Mr. Moran was sad and anxious throughout the evaluation, and tearful at times. He denied suicidal and homicidal ideation, plan, or intent as well as non-suicidal self-injurious behavior.

14

*Reported Daily Activities*

Mr. Moran said that he gets up in the mornings and attends to household chores or minor yard work. He described spending time with his children and stated that he enjoys being able to do things he did not have time for when he was working, such as helping elderly neighbors, attending school events for his youngest daughter, and going for walks. He noted that he has particularly enjoyed volunteer work with an organization called Best Buddies that helps children with disabilities. Mr. Moran's wife, Ms. Moran stated during a collateral interview that they decided to adopt a puppy in December, 2020 and that Mr. Moran gets up every morning to tend to the dog, feeds it and walks it, and has been taking their youngest daughter to school. She also described Mr. Moran as very engaged in tending to the house and yard, and reported that he regularly contributes to household chores and accompanies her on household errands. Both Mr. and Ms. Moran described themselves as committed to their faith and to their church, and stated that they generally attend church services on a weekly basis.

Vocational assessment report by Dr. Jeffrey Joy dated 12/11/2019

Mr. Moran's descriptions of his current daily activities and abilities was consistent with the results of a vocational evaluation conducted Dr. Jeffrey Joy on 12/11/2019. Dr. Joy reported that Mr. Moran is "now able to perform lawn work and snow removal. He can clean gutters window cleaning, staining painting, and power washing." Dr. Joy also reported that Mr. Moran is capable of managing finances and using email and a computer.

Dr. Joy concluded that Mr. Moran's symptoms of Posttraumatic Stress Disorder limit his ability to work in settings involving "public transportation, responsibility for the safety of others, or conflict-prone customer service environments such as collections." However, Dr. Joy further stated that "Mr. Moran's employability in other settings is otherwise favorable and is a good prospect for vocational rehabilitation." He estimated that Mr. Moran is currently able to work in a variety of entry-level jobs such as stock clerk, retail store clerk, or janitor.

**Collateral Interviews**

I conducted a telephone interview lasting one and one-quarter hour on March 3, 2020 with Mr. Moran's wife, Norma Moran and a one-half hour telephone interview with Dr. Michael Bellotti on March 4, 2020. The interviews were each conducted at my request, and Ms. Moran and Dr. Bellotti were both made aware of the limits of confidentiality at the beginning of the interview. I explained to them that I had been retained by Steven Efron, the attorney representing MTA, and that Mr. Moran and his attorney had both consented to my contacting them. I indicated that I would be making notes about our conversation, which would be provided to Mr. Efron and included in my report. I further explained that the results of our interviews would then become part of the record of the Court. Ms. Moran and Dr. Bellotti each gave verbal consent for participation in the interview, for the inclusion of this information in my report, and release of this information to Mr. Efron.

15

*Norma Moran*

Ms. Moran told me that she and Mr. Moran met in 1991 and were married in 1994. She described the birth of their four children and spoke about their son's learning difficulties, executive functioning difficulties, and health problems associated with the diagnosis and treatment of his back tumor. She spoke about the importance of faith to both her and her husband, and stated that their family is close, loving, and supportive of each other. Ms. Moran said that Mr. Moran had always been a hard worker, and that it had been his dream to work on the railroad. She indicated that they had agreed he would be the primary financial provider for the family and that she would be at home caring for their children. She does work part time as a nursing assistant, but stated that Mr. Moran has always earned the majority of their family income.

Ms. Moran reported that Mr. Moran had always been very outgoing and socially active. She stated that he enjoyed talking with others, and often met friends for a drink and attended as many social and family events as his work schedule allowed. She reported that he was easy going and flexible, and that he always put his family first. She said that prior to the arrest, had been able cope with stress well and managed his anxiety. She stated that she has not known him to have a history of depression or other psychological disturbance.

Her description of the incidents immediately following Mr. Moran's arrest, including his calls to her and his state of mind when she saw him in court, were largely consistent with his reports. She reported that when she and her daughter arrived at the courthouse to pick him up, Mr. Moran was pale, shaky, disheveled, and "looked like he had aged ten years." She stated that he became a "different person" after the arrest, and reported that he was extremely withdrawn, irritable, easily fatigued, avoidant of social interactions, even with close family, and fearful and panic ridden when riding on trains or encountering police officers. Ms. Moran also reported that Mr. Moran has been extremely worried and guilt ridden about the impact of his inability to return to work on his family.

In addition, she described him as often ruminating about the events that occurred during the arrest, and about the psychological impact on their children. She reported that their daughter Shannon has been particularly impacted by seeing him in court, and has been in treatment for anxiety related to her father's arrest.

Ms. Moran said that she has noticed significant improvement in Mr. Moran's mood and functioning over time. She stated that he is now able to volunteer with Best Buddies, and has taken over household responsibilities such as driving their daughter to school, doing yard work, walking the dog, and helping her with shopping and other errands. However, she also reported that he remains somewhat socially avoidant and still has difficulties when faced with reminders of the arrest, and is unable to ride on trains or interact with police officers without significant anxiety and fear. For example, Ms. Moran described a recent incident where Mr. Moran was pulled over while driving by the police, who

16

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

reportedly ran the wrong license plate. She stated that even though the police told him they had made a mistake and let him go, he was anxious and agitated about the incident. Similarly, she described a recent family wedding where Mr. Moran sat alone for much of the reception and generally avoided talking to others. She distinguished this behavior from former behavior where he was "the life of the party" and would have been "dancing all night" and talking to everyone.

When asked about Mr. Moran's areas of strength and resilience, Ms. Moran reported that Mr. Moran is a loving and involved father, and that he is generous with his time and has a strong desire to help others. She also stated that in spite of all that the family has gone through, she believes that their marriage has become stronger. She indicated that they continue to have a loving and intimate relationship, and that she does not believe that their marriage has been negatively impacted by the incidents of August, 2017.

*Michael Bellotti, Ph.D., LMFT*
Dr. Bellotti indicated that he earned his doctorate in Educational Psychology and then later received training and licensure as a marriage and family therapist. He described his practice as a general psychotherapy practice, and reported that he has recently retired. Following his retirement, he stated that he had referred Mr. Moran for ongoing psychotherapy with another practitioner in Connecticut.

Dr. Bellotti reported that he had met with Mr. Moran both individually and with his son when Mr. Moran's son was an adolescent. He stated that although Mr. Moran was "a worrier," he did not believe that Mr. Moran had experienced significant psychological difficulties prior to his arrest in August, 2017. Dr. Bellotti described Mr. Moran as generally psychologically healthy and as someone with good social supports, healthy family relationships, and good coping skills.

Dr. Bellotti told me that he resumed treatment of Mr. Moran within several days of his arrest, and that he diagnosed Mr. Moran with Posttraumatic Stress Disorder. He described Mr. Moran's symptoms of intrusion, flashbacks, avoidance, depressed mood, irritability and hypervigilance, all of which he stated were in support of his diagnosis. Dr. Bellotti said that for the first six months of treatment he saw Mr. Moran on a twice weekly basis. He stated that treatment was almost exclusively focused on the arrest and its aftermath, and on Mr. Moran's concerns for the impact of the events on his family
. Dr. Bellotti stated that Mr. Moran was compliant with treatment and that he was initially somewhat successful with exposure-based assignments that required him to practice going to the train parking lot, riding on the train, and going into Grand Central Terminal. He also stated that Mr. Moran's level of social and emotional functioning also improved significantly with treatment.

Dr. Bellotti reported that in spite of Mr. Moran's overall improvement in functioning, his symptoms of anxiety and distress when faced with reminders of the arrest such as riding on trains, going into NYC, or interacting with police officers, have been resistant to change. He stated that it was now his clinical opinion that Mr. Moran's limitations in

17

those areas are, and will remain, longstanding and significant, and that though he is likely able to return to other areas of work and healthy functioning, he will be unable to return to work for MTA in any capacity.

## Psychological Testing Results and Interpretation

Mr. Moran was evaluated using a semi-structured psychosocial history interview, structured clinical interviews and the administration of several psychological tests, checklists and structured questionnaires.

*Validity and Response Style*

Mr. Moran was administered the Folstein Mini Mental Status Exam (MMSE), and his total score on this measure was 30 out of 30. His responses to this measure and to clinical interview suggested that he was not suffering from any cognitive deficits that would have negatively impacted the results of the evaluation.

In a forensic context, where a motivation exists to misrepresent levels of psychological distress, the issue of malingering or the false report of symptoms must be carefully considered and assessed. **The Miller Forensic Assessment of Symptoms Test (M-FAST)** is a screening measure that was developed to assess the deliberate distortion of self-reported symptoms. Mr. Moran's total score on the M-FAST was 5 out of a possible 25, which was consistent with responses typical of honest responders.

An examination of the evaluation as a whole and of Mr. Moran's overall response style indicated that his responses across measures were consistent and he attended appropriately to item content. The results of the validity scales of the tests administered, in combination with Mr. Moran's presentation throughout the interview support the conclusion that Mr. Moran has a defensive response style and was motivated to make a positive impression. He exhibited a tendency to minimize minor faults and shortcomings, and it is therefore likely that his test results represent a minimization of difficulties in particular areas. Combined results from psychological testing, clinical examination, and external corroboration suggest that Mr. Moran is not malingering, exaggerating, or feigning mental illness.

*Personality Functioning*

The **Personality Assessment Inventory (PAI)** is a 344-item objective inventory of adult personality used to assess areas of psychopathology. The PAI also provides information relevant for possible clinical diagnosis. This assessment tool contains a number of validity indices designed to assess response style and factors that could impact and/or distort the validity of the testing. These factors include results such as positive or negative impression management, failure to complete the test properly, confusion, a tendency to respond to items in a careless or inconsistent manner, defensiveness, exaggeration, malingering, and a tendency to endorse items in an improbable manner.

Mr. Moran's **PAI** profile scores on validity indices indicated that he attended to item content in an appropriate manner and responded consistently to similar items. However,

18

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

he demonstrated a great deal of defensiveness as well as a reluctance to admit to common shortcomings, and he appeared to be highly motivated to present himself in a positive manner. As a result of his response style, it is likely that his scores on the clinical scales of the PAI reflect a similar distortion and minimization of difficulties, and should be interpreted with caution. Mr. Moran did not appear to be trying to present himself in an overly negative manner, and his responses on the items of the PAI validity scales did not suggest that he was exaggerating or fabricating psychological symptoms.

Mr. Moran's responses to the clinical items of the PAI suggested that he was experiencing significant difficulties with traumatic stress, as well as stress and turmoil in his environment. He endorsed experiencing a significant number of health concerns and physical complaints, as well as physical symptoms of depression. He did not report difficulties with mood, anger, paranoid thinking, or problems associated with alcohol or other drug use.

The PAI findings are largely consistent with Mr. Moran's self-report, information gathered during collateral interviews and contained in his medical records, and by his performance on other assessments.

*Mood and Anxiety*
The **Beck Depression Inventory – II (BDI-II)** is a self-report screening inventory that assesses attitudes and symptoms characteristic of depression experienced by the respondent over the past two weeks. Mr. Moran's total score on the BDI-II was 20 out of total maximum score of 63, suggesting that he was experiencing moderate symptoms of depression at the time of the evaluation.

The **Beck Anxiety Inventory (BAI)** is a self-report screening inventory that assesses the severity of common symptoms of anxiety experienced by the respondent in the past week. Mr. Moran's total score on the BAI was 6 out of a total maximum score of 63, indicating he was reporting minimal symptoms of anxiety at the time of the evaluation.

The **Mood Disorder Questionnaire (MDQ)** is a self-report instrument used to screen for symptoms suggestive of Bipolar Disorder. Mr. Moran's responses on the MDQ resulted in a negative screen, suggesting that he was not experiencing symptoms of Bipolar Disorder.

*Trauma*
The **Traumatic Stress Inventory – 2 (TSI-2)** is a measure of both acute and chronic posttraumatic symptomatology. The TSI-2 contains validity scales designed to assess factors that could distort the validity of the testing results such as exaggeration, minimization, improbable or infrequent combinations of symptoms, confusion, careless responding, or malingering. The results of the TSI-2 validity scales resulted in a valid

19

profile, suggesting that Mr. Moran attended to the items and did not attempt to exaggerate his psychological symptoms or to present himself in an inaccurately negative manner.

The results of the TSI-2 clinical scales indicated that Mr. Moran's areas of greatest distress and symptomatology had to do with intrusive experiences and defensive avoidance. He also endorsed symptoms of dissociation, anxious anxiety, and depression. His responses on this measure were consistent with his self-report, review of medical records, and with information gathered during other assessments and collateral interviews with his wife and psychotherapist.

The **Trauma and Attachment Belief Scale (TABS)** is a self-report measure designed to assess beliefs about oneself and others that are sensitive to the effects of traumatic experiences in the areas of safety, trust, esteem, intimacy, and control. Mr. Moran's TABS total score was 44T, in the Low Average range when compared with other individuals in outpatient psychotherapy. His most elevated subscale score was Self Intimacy (67T), in the Very High range. His score on this subscale suggested that he may find time alone to be difficult, and may therefore be avoidant of it. Mr. Moran's lowest subscale scores were Other Control (25T) and Other Esteem (27T), both in the Extremely Low range. These subscale scores indicated that Mr. Moran likely experiences a relatively low need for control in his relationships with others and generally has a much lower tendency than others to view people with disdain or disrespect. Mr. Moran's scores on the other subscales of the TABS were all in the Low, Low Average, or Average range.

The **Adverse Childhood Experience (ACE) Questionnaire** and the **Life Events Checklist (LEC)** are both self-report measures designed to assess for exposure to adverse and potentially traumatic life events.

The **ACE Questionnaire** assesses for adverse experiences occurring prior to age 18 such as physical or emotional maltreatment, sexual abuse, experiences of neglect, exposure to violence and exposure to household members with significant mental illness or substance abuse. Mr.  score on the ACE questionnaire was 0 out of 10, indicating that he did not experience significant adverse experiences during childhood.

On the **LEC**, Mr. Moran was asked to indicate which of a number of "difficult or stressful things that sometimes happen to people" he had experienced, witnessed, learned about, or that he had been exposed to as part of his job. He indicated that he was exposed to a hurricane when he had to work during Hurricane Sandy, that he had been physically assaulted by the MTA police, that he had witnessed police brutality at Grand Central Terminal, and that he had been threatened with a knife by someone on a train while he was working as a conductor. He identified as the "worst event" as the "physical assault by the MTA police and the way I was treated by them for doing nothing wrong" on

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

8/4/2017. Following completion of the LEC, Mr. Moran was then asked to complete the Posttraumatic Checklist referencing the "worst event."

The **Posttraumatic Checklist (PCL-5)** is a self-report measure designed to assess for symptoms of PTSD experienced by the respondent in the past six months. PTSD is a disorder that may develop following the experience of a traumatic event involving exposure to "actual or threatened death, serious injury, or sexual violence. Symptoms are categorized into four clusters that are experienced in relation to that specific traumatic event: Intrusive memories, persistent avoidance, negative alterations in cognition or mood, and marked alterations in arousal and reactivity. In order to meet the criteria for diagnosis, the symptoms must also cause clinically significant distress or impairment in functioning.

On the PCL-5, Mr. Moran's total score for the past month was 57 out of a total score of 80, suggesting that he is experiencing symptoms of PTSD that warrant further evaluation. He endorsed symptoms on all four symptom clusters for PTSD: intrusion, avoidance, cognition and mood, and arousal and reactivity.

Specifically, on the PCL-5, Mr. Moran endorsed symptoms of intrusion such as unwanted memories and dreams, flashbacks, and feelings of upset and physical reactions when reminded of the incident. He reported symptoms of avoidance such as avoiding memories, thoughts, feelings and reminders of the incident. He reported difficulties with cognition and mood such as blaming others, having strong negative feelings, loss of interest in previously enjoyed activities, and feeling distant or cut off from others. Finally, he endorsed symptoms of arousal and reactivity such as feeling "on guard", and difficulties with sleep and concentration.

Because Mr. endorsed symptoms consistent with PTSD on the PCL-5, the **Clinician-Administered PTSD Scale for DSM-5, Past Month Version (CAPS-5)** was administered. The CAPS-5 is a structured clinical interview that can be used to make a current and past diagnosis of Posttraumatic Stress Disorder (PTSD.) During this interview, Mr. Moran detailed clinically significant symptoms associated with the "physical assault by the MTA police" on all four symptom clusters of PTSD.

Specifically, during the past month, Mr. Moran reported four clinically significant symptoms of intrusion associated with the traumatic event, including intrusive memories, distressing dreams, dissociative reactions (flashbacks), and psychological distress and physiological reactions in response to reminders of the event. Next, he reported two clinically significant avoidance symptoms which included both avoidance of memories, thoughts and feelings of the incident and avoidance of external reminders such as train travel and interactions with police officers. He endorsed three clinically significant symptoms associated with cognition and mood, such as persistent feelings of fear and anger, inability to participate in or to enjoy previously enjoyed activities, and difficulties experiencing positive emotions. Finally, Mr. Moran described three clinically significant

21

symptoms of arousal and reactivity, which included feeling "on guard," difficulties with concentration, and sleep difficulties.

Mr. Moran's reports of posttraumatic stress symptoms over the course of the past month was associated with moderate subjective distress and impairment in social functioning and severe impairment of his occupational functioning as a Conductor for the Metro-North Railroad.

*Disability*
The **World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0)** is a self-administered measure that assesses disability across six domains in adults over the age of eighteen. The six domains include understanding and communicating, getting around, self-care, getting along with others, life activities (such as household, work, and/or school activities,) and participation in society.

Mr. Moran's responses on the WHODAS 2.0 resulted in scores suggesting no significant impairment in the domains of getting around or household activities (average domain scores of 1.2 and 1.3 out of 5 respectively.) He endorsed mild impairments in the domains of understanding and communicating, self-care, and getting along with people (average domain scores of 2.3, 2, and 1.8 out of 5 respectively.) Mr. Moran identified moderate impairments in the domain of participation in society (average domain score of 3.6 out of 5) and extreme impairments in his work activities due to his reported inability to return to his work as a Conductor (average domain score 5 out of 5.) His general disability score was 91 out of 180, with an average general disability score of 2.5 out of 5, indicating mild disability.

The **Diagnostic and Statistical Manual of Mental Disorders: fifth edition (DSM-5)** is a diagnostic and classification tool used by health care providers and published by the American Psychiatric Association. The results of Mr. Moran's CAPS-5, in combination with his performance on other psychological assessment measures, and responses to clinical support the conclusion that Mr. Moran currently meets full DSM diagnostic criteria for Posttraumatic Stress Disorder.

These psychological testing findings are consistent with the information gathered from Mr. Moran's medical records, deposition testimony from his psychological and psychiatric treatment providers, and collateral interviews with his wife and psychotherapist.

## Summary and Conclusions
*Summary*
Mr. Moran is a 50-year-old man who was referred for a forensic evaluation by Mr. Efron, an attorney representing Metro-North Railroad (MTA). Mr. Moran is a plaintiff in a lawsuit against MTA in which he alleges experiencing emotional injury as a result of his arrest by MTA officers when he was working as a conductor at Grand Central Terminal on August 4, 2017.

22

The history taken in this evaluation, along with a review of medical records, transcripts of deposition testimony and collateral interviews with Mr. Moran's wife and psychotherapist, indicate that in the time period prior to his arrest on August 4, 2017, Mr. Moran was coping with a number of stressors largely related to his children's health, and specifically his son's recent surgical treatment for a tumor in his back. He also had a reported tendency to be a "worrier" and a "rule follower" and to experience anxiety in response to stress. He reported a history of high cholesterol, thyroid dysfunction, and sleep apnea, and has been using a CPAP machine for approximately two years. Mr. Moran had participated in several family and individual therapy sessions to address his anxiety and family-related difficulties, but overall, Mr. Moran had a demonstrated ability to cope adaptively with the stress and anxiety in his life. There was no evidence of significant impairment in his relationships with others, social life, or work performance, nor was there evidence of a prior history of significant mental health or substance use difficulties.

At the time of Mr. Moran's arrest by MTA officers on August 4, 2017, Mr. Moran experienced fear of serious bodily injury, pain, and confusion about why he was being arrested. During the arrest, he was taken to the ground by several officers, one of whom was holding a dog, and experienced pain in his back and shoulders, according to both his self-report and medical records. In addition, during his detention, Mr. Moran reportedly was verbally threatened with sexual violence by other detainees. He stated that because he witnessed these other detainees engaging in unlawful, drug-related behavior without repercussion, he believed that he would not be protected if he were sexually assaulted. In addition, he had no prior exposure to the legal system or to incarceration, and his confusion about what would happen to him functioned to exacerbate his fear.

Following the 2017 arrest, Mr. Moran reported post-traumatic symptoms related to the arrest, and was diagnosed with Posttraumatic Stress Disorder by his treatment providers. His symptoms in the six months to one year following the arrest were moderate-to-severe, and included intrusive memories and dreams of the arrest as well as avoidance of trains, former co-workers, and uniformed police officers, in addition to significant social avoidance. Mr. Moran has been engaged in psychological and psychiatric treatment that has included exposure to avoided situations, and his symptoms of posttraumatic stress have improved over time. He is now able to walk in his neighborhood, attend school events for his children, and actively participate in household chores, yardwork, and volunteer work for his church and an organization benefitting disabled children.

In spite of Mr. Moran's reported and documented compliance with and progress in treatment, he remains unable to travel on trains, interact with employees of the MTA, interact with police officers, or go into Grand Central Terminal without experiencing significant anxiety and exacerbation of posttraumatic stress. Although his overall level of daily functioning is likely to continue to improve with ongoing treatment, and his prognosis for functioning outside of the MTA is good, he is unlikely to be able to successfully return to work for the Metro-North Railroad. Reports of Mr. Moran's

Forensic evaluation report of Thomas Moran
By Lisa M. Rocchio, Ph.D.
03/09/2020

improvement in functioning, ongoing difficulties, and prognosis are consistent with information obtained from review of his medical records and collateral interviews with his wife and therapist.

*Conclusions*

1. There is consistent support for the conclusion that prior to the events on August 4, 2017, Mr. Moran did not suffer from significant psychological disturbance or functional impairment. Though he has a reported history of anxiety and had experienced significant stressors related to the health and wellbeing of his children, his overall level of functioning and performance, both personally and professionally, was consistently high.

2. Results of this evaluation indicate that while there may have been other contributing factors such as Mr. Moran's history of anxiety and experience of family stressors, Mr. Moran experienced significant psychological symptoms arising from the physical force utilized by the officers, and the resulting physical pain and fear of severe bodily injury during and following his arrest on August 4, 2017 that appear to be posttraumatic in nature.

   Mr. Moran's fear for his safety and confusion about the behaviors of the police officers, in combination with his strong belief that he had done nothing wrong and his history of compliance with authority figures increased his vulnerability to the feelings of powerlessness, fear, and lack of control and appeared to overwhelm his coping abilities. In addition, Mr. Moran's symptoms of posttraumatic stress were likely further exacerbated by his fears of sexual violence once he was placed in detention. He reportedly witnessed lawless behavior that was not met with legal consequence, and was threatened with sexual violence by other detainees. These factors contributed significantly to his fear of serious bodily injury and sexual violence, as well as his confusion and sense of loss of control.

   Mr. Moran currently meets DSM-5 diagnostic criteria for Posttraumatic Stress Disorder, Chronic. In this case, I have identified the Criterion A stressor as the physical force, fear, and pain he experienced during the events surrounding his arrest and subsequent detention by the MTA police on the August 4, 2017.

   In a forensic context, where a motivation exists to falsely report psychological distress, the issue of malingering or the false report of symptoms must be carefully considered and assessed. On a screening measure that was developed to screen for the deliberate distortion of self-reported symptoms M-FAST, Mr. Moran endorsed symptoms and psychological problems in a manner consistent with honest responders. In addition, an examination of the evaluation as a whole and of Mr. Moran's overall response style indicated that his responses across measures were consistent. The results of the validity scales of the tests used support the conclusion that Mr. Moran exhibited a defensive response style and

24

that the combined test results are likely valid, though potentially minimized reflections of Mr. Moran's experience of his current psychological state.

Mr. Moran's self-report of the incident in question was consistent with that from external data sources such as a video recording of the arrest and his reports to treatment providers and his wife at that time as documented in his medical and psychological treatment records and corroborated by interview with his wife and psychotherapist.

3. Though there is considerable evidence that Mr. Moran experienced severe symptoms of posttraumatic stress and functional impairment in the months following the events of August 4, 2017, there is significant support for the conclusion that Mr. Moran currently experiences mild-to-moderate and intermittent psychological symptoms which rarely impair his daily functioning outside of his former work as a conductor. He has made significant progress in treatment and reportedly experiences intermittent symptoms when faced with reminders of the incident or when needing to travel on trains or interact with police officers.

The conclusion of this forensic evaluation that apart from his work as a conductor, Mr. Moran is currently able to function well in daily activities, interactions with others, volunteer work, and family activities is supported by psychological testing, review of medical records and deposition testimony by his treating psychologist and psychiatrist, the report of the vocational expert hired by Mr. Moran's attorney, and by collateral interviews with his wife and psychotherapist.

Mr. Moran's prognosis for recovery and successful employment outside of the Metro-North Railroad with continued treatment appears to be good.

*As with all forensic evaluations, these conclusions are tentative and subject to revision should new information be made available to me that would impact my current impressions and opinions.*

Respectfully submitted,

Lisa M. Rocchio, Ph.D.
Clinical and Forensic Psychologist
Licensed in RI, NY, and MA

03/09/2020
Date

25