App'x 5

1  reviewed and were described in the previous question, do you
2  have an opinion to a reasonable degree of vocational and
3  economic certainty as to Mr. Moran's future earning capacity?
4  A.  Yes.
5  Q.  And what is your opinion and basis for it?
6  A.  Well, my opinion is that he has a future earning capacity
7  based upon the time of my report of anywhere earning between
8  31,000 and $36,000 per year without additional training or
9  vocational adjustment.  And that's based upon my evaluation, my
10 review of his work history, his educational attainment, his
11 tested abilities, and my own experience, training, and
12 education related to conducting this type of work.
13 Q.  And did you have -- do you have an opinion based on your
14 training, education, experience, and the materials I have asked
15 you about your review of in the previous question about what
16 Mr. Moran could earn with a year of training, what his earning
17 capacity would be?
18 A.  Yes.  I -- yes.
19 Q.  What would it be?
20 A.  With up to an additional year of training, I thought that
21 he could work as a school paraprofessional, earning about
22 $31,000 per year; a social service aide, earning about $39,000
23 per year; or a recreation aide, earning about $34,000 per year.
24          I also thought that, potentially, with some Microsoft
25 Office training, he could work in a more office environment,

1  A.  That's my understanding based upon the records I reviewed
2  and based upon my interview with Mr. Moran.
3  Q.  I see that on page one of your report you had a phone
4  interview conducted on December 2 of 2019.  I take it that was
5  a phone interview with Mr. Moran?
6  A.  Yes.
7  Q.  What was discussed during that interview?
8  A.  I don't recall offhand.  I would be glad to look in my
9  notes if I am free to do so, but I don't recall specifically.
10 Q.  Do you have your notes with you in front of you?
11 A.  I do have notes, yes.
12           MR. EFRON:  With the Court's permission, may the
13 witness look at his notes for that date?
14           THE COURT:  Sure.
15 A.  So I have looked at my notes, counselor, and the only notes
16 that I have are from the initial vocational interview and just
17 based upon my business practices, in this case I had seen him
18 in August of 2019, and then I had written the report in
19 December of 2019, so it would not have been unusual for me to
20 call and confirm information that we may have discussed during
21 the initial interview.  I can't say with any certainty exactly
22 what we spoke about.
23 Q.  Your report is dated December 11, 2019, correct?
24 A.  Yes.
25 Q.  And there has been no supplementation of that report since

1    December 11, 2019?
2    A.   That is correct, counselor.
3    Q.   So you don't know as of today whether the information you
4    relied on—the medical information and the psychiatric
5    information—still pertains to this situation?
6    A.   Well, I do.  I mean, I did recently speak to Mr. Moran.  He
7    confirmed that he continues in mental health treatment.  He
8    confirmed that he had followed through on my recommendation to
9    seek out vocation rehabilitation services with the State of
10   Connecticut and I think he also indicated that he had
11   independently conducted a job search without success.
12   Q.   When did you obtain this information from Mr. Moran?
13   A.   I think I spoke with him on Monday or Tuesday of last week
14   by phone.
15   Q.   You mentioned a number of salaries or hourly rates
16   associated with certain positions and jobs and I take it that
17   the numbers you related apply to 2019 but not beyond, is that
18   true?
19   A.   Correct.
20   Q.   Have you done any work to update the salaries that
21   Mr. Moran can earn today?
22   A.   No.
23   Q.   Do you rely on the Department of Connecticut Labor [sic]
24   market information?
25   A.   Yes.

1    Q.   Did you rely on it in this case?
2    A.   Yes.
3    Q.   What market information does the Connecticut Department of
4    Labor publish?
5    A.   They include wage information as well as numbers of jobs
6    here in the State of Connecticut.
7    Q.   I am looking at the Connecticut Department of Labor, labor
8    market information for the first quarter of 2022.  Have you
9    seen that document in the course of your profession?
10   A.   Well, that would be the current -- 2022 is the current
11   publication.  So we are in, what is it, April of 2023.  I
12   believe the first quarter of 2022 would be the most current
13   labor market information, and I have seen that data for 2022.
14   Q.   One of the jobs listed in this market information is social
15   and human service assistants.  What is that?
16   A.   It's an occupational category for persons that work in a
17   variety of support roles and a variety of different settings.
18   Q.   And I believe you indicated in your direct testimony that
19   Mr. Moran could perform work as a social service aide, correct?
20   A.   With some additional training, I believe up to a year of
21   training.
22   Q.   Is that a job equivalent to social and human services
23   assistants listed in the Connecticut Department of Labor
24   information?
25   A.   Yes.  That's the data.  The data in my report is from --

1    you are referencing the first quarter of 2022 and I am
2    referring to the same information but published in the first
3    quarter of 2019.
4    Q.  For social and human service assistants in the first
5    quarter of 2022, the average salary is listed at $53,333.
6              MR. PERRY:  Objection, your Honor.
7    Q.  Does that surprise you?
8              THE COURT:  Overruled.  You may answer.
9    A.  That, I would want to check that or see the source of your
10   information, counselor.
11   Q.  Can I put that on the screen for you?  Maybe I can figure
12   this out.
13             MS. CYR:  Without it being published to the jury.
14             MR. EFRON:  Oh, yeah.
15   Q.  Can you see this document?
16   A.  I don't see a document, counselor.
17             (Pause)
18             THE COURT:  We are going to inquire as to whether we
19   can manage that technologically speaking, but I don't have an
20   answer for you immediately.
21             MR. EFRON:  Can I leave it there, your Honor?
22             THE LAW CLERK:  That's fine.
23             THE COURT:  Yes, you can leave it there.
24   BY MR. EFRON:
25   Q.  Dr. Joy, were you asked to update any of your information?

1   A.  No.
2   Q.  Is that something that you would customarily do in your
3   profession?
4   A.  Sometimes.  Sometimes I am asked to and sometimes I am not.
5   It's really up to the referral source.
6   Q.  Now, you indicated that some three days ago you spoke to
7   Mr. Moran and he informed you that he applied to some
8   vocational rehabilitation facility or entity associated with
9   the State of Connecticut?
10  A.  Yes.  I believe he went to the Waterbury office and met
11  with a vocation rehabilitation counselor on several occasions.
12  Q.  When was that approximately?
13  A.  I am going based upon memory because I know I didn't take
14  notes, but I think it was in -- it was just before COVID, so it
15  would have been in the end of 2019 and then those services
16  discontinued with COVID.
17  Q.  And did he tell this to you subsequent to your report or
18  before you issued your report?
19  A.  After my report.  I think that -- yeah, I apologize.
20  Obviously after my report, because he just told me about it a
21  week ago.
22  Q.  And he told you a week ago that he applied for this
23  vocational rehabilitation program how long ago?
24  A.  Well, it was before COVID, so sometime in late 2019 or late
25  2020.

1   Q.   Did he tell you what became of his application for
2   vocational training?
3   A.   No.  He seemed a little confused or unaware of the process.
4            THE COURT:  Counsel, would you approach, please.
5            (Continued on next page)

1   A.   I believe during the initial vocational interview in -- on
2   August 8, 2019.
3   Q.   And how did he express it to you?  What did he say?
4   A.   It's related to activities of daily living.  He, as I
5   recall, referenced difficulties communicating with his family
6   members, being argumentative with his wife and children, being
7   socially avoidant during family gatherings.
8   Q.   And when you spoke to him recently, did you -- I'm sorry,
9   withdrawn.
10          Did you speak to him recently or was it just
11  Mr. Cahill?
12          MR. CAHILL:  Objection.
13  A.   I spoke with Mr. Moran recently.
14  Q.   And did he reiterate that he still has a -- reiterate that
15  he has anger management issues?
16  A.   Not that I recall, but I may not have asked -- I don't
17  recall specifically asking him that specific question.  It was
18  a fairly short phone call, so I would not have done a complete
19  reevaluation.
20  Q.   Do you have an idea as to what percentage increase salaries
21  have gone up since the date of your report?  And I am speaking
22  generally now, not in any particular job category.
23  A.   I think in general most wages have been increased between 3
24  and 6 percent.
25  Q.   Is that more than you anticipated in your report?

1  A.  I don't think so, not substantially so.  Certain
2  occupations, of course, may outpace wage growth rates than
3  others, but at the time of my evaluation in 2019 and the
4  document you are referring to, the Connecticut Department of
5  Labor labor market information from the Office of Research
6  includes historical median wage history increases.  There is a
7  column there on that document that you are looking at, and
8  those just mean casually looking at the historical increases,
9  say, for instance, between 2010 and 2018, the annual increases,
10 increase anywhere between it looks like a low of 1.2 percent to
11 a high of 3.5 percent for office clerks, for example.
12 Q.  I am told that the document that I am looking at has been
13 sent to you by e-mail, if you have the means to check that, and
14 perhaps we can compare the two documents and see if we are
15 talking about the same thing.
16 A.  So we are talking about the same Office of Research.  You
17 are citing a report that I did not specifically look at when I
18 worked on this particular evaluation, but it's a report with
19 which I am familiar.  You are citing a report for occupational
20 projections that the Department of Labor is making between 2020
21 and 2030.
22 Q.  Well, I want to go back to my original question, Dr. Joy,
23 which is, is your reference to social -- I'm trying to find the
24 reference to social service aides, I think you called it.  Am I
25 mistaken?

1    A.  No, I believe you are correct.
2    Q.  I believe I am, too.
3            So what's the distinction between social service aides
4    and social and human service assistants which I have on my form
5    and you now have on the form that was sent to you?
6    A.  Let me just double check that.
7            So, counselor, in my opinion, it's actually the same
8    occupation I am referring to in my report as a social service
9    aide and the Department of Labor refers to it as a social
10   service assistant.  It's the same occupation, and that's the
11   information I was referring to in my report when I cited the
12   wage information for 2019.
13   Q.  So in -- so in the first quarter of 2022, Mr. Moran could
14   have been in the job as a social or human service assistant
15   paying an average of $53,333 a year, correct?
16   A.  I'm looking for that on the document that you have provided
17   me.  It's what, three pages long?  Which page is it on,
18   counselor?
19   Q.  It's on the occupations with the most openings, all levels,
20   page four.
21   A.  So according to this, that is the average for 2022, that is
22   correct.
23   Q.  So he could have been making more --
24   A.  If you --
25   Q.  Correct?  He could have been making more than 53,000?

1   A.   It's possible, although I expect that as somebody who would
2   be newly trained, brand new in the occupation, that he would be
3   below average.
4            MR. EFRON:  Thank you, Dr. Joy.  I appreciate it.  No
5   further questions.
6   A.   You are welcome, counselor.
7            THE COURT:  Redirect.
8   REDIRECT EXAMINATION
9   BY MR. PERRY:
10  Q.   Dr. Joy, MTA's attorney asked you a lot about Dr. Kramer.
11  Am I correct that when you did your functional analysis in
12  2019, in December, that you concluded that there were no
13  physical limitations with respect to Mr. Moran?
14  A.   That's correct, and I indicated in my report that his
15  physical troubles, regardless of the pain report, had
16  essentially resolved by June of 2019.
17  Q.   And MTA's attorney asked you about Mr. Moran's application
18  for services to the State of Connecticut.
19           MR. PERRY:  I am going to offer as a full exhibit
20  Defendants' Exhibit K, a two-page application for services at
21  this time, your Honor.
22           MR. EFRON:  No objection.
23           THE COURT:  It is admitted.
24           (Defendants' Exhibit K received in evidence)
25           MR. PERRY:  No additional questions.  Thank you for