App'x 6

1   United States Department of Labor for the purpose of
2   determining Mr. Moran's future wage growth in order to project
3   it, as well as to put a value on Mr. Moran's fringe benefits
4   from alternative employment.
5   Q.  Did those secondary sources contain facts and data that are
6   reasonably and customarily relied upon by economists in your
7   specialty to prepare analysis and form opinions of an
8   individual's lost earnings capacity?
9   A.  Yes, they are.
10  Q.  What major facts and assumptions were used to obtain
11  earning capacity lost estimates in this case?
12  A.  All right.  I -- well, first of all, I did assume that, as
13  of July 1, 2020, Mr. Moran would be employable in entry-level
14  employment post injury.  I did calculations that were based
15  upon three different retirement ages -- ages 60, 62, and 65.
16          I assumed that from an alternative employment that
17  Mr. Moran would have fringe benefits such as health benefits,
18  retirement benefits.  All future losses are discounted to
19  present value.
20  Q.  With respect to Mr. Moran's earnings capacity and your
21  review of Dr. Joy's report, what did you assume as of 2022 was
22  the net compensation that Mr. Moran could be earning?
23  A.  Well, Mr. Moran's net compensation in 2022 that I assumed
24  he would be earning -- and that includes wages, health benefits
25  provided by an employer, retirement benefits that he would

1   receive from an employer, a net of Social Security, Medicare,

2   and income taxes, I assumed $53,153.

3   Q.  Can you explain how pension loss was computed.

4   A.  Sure.  Mr. Moran had a defined benefit pension plan from

5   Metro-North.  It was based upon -- there are several factors

6   that go into it that include your highest three years of

7   compensation or highest 36 months.  There's a specified formula

8   that is used to calculate the pension.

9            And what I did in calculating pension loss was I

10  attempted, for each possible retirement age, to calculate the

11  difference between what his pension -- what his actual pension

12  is based on service at Metro-North through the time of the

13  incident in this case and the pension he would have had if he

14  continued to work at Metro-North.

15  Q.  What did you assume, if anything, with respect to

16  Mr. Moran's life expectancy?

17  A.  I assumed that he had a normal life expectancy.  When he

18  was injured on August 4, 2017, I calculated his life expectancy

19  as 29.78 additional years from August 4, 2017.  That is based

20  upon the life expectancy of a 48.35-year-old male which would

21  have been his age on August 4, 2017.

22  Q.  Could you define for the jury and the Court what "present

23  value" is.

24  A.  Sure.  Normally what economists do is they take into

25  account that if -- let me put it this way:  Hypothetically

1  Q.  You know Dr. Tranfa-Abboud; correct?

2  A.  Yes.

3  Q.  You attend conferences together?

4  A.  Yes.

5  Q.  You've been in cases on opposite sides together?  If that

6  makes sense.

7  A.  Actually, other than this case, I think this is the only

8  case we've gone against each other actually.

9  Q.  It's a first.

10          How long have you known each other?

11  A.  I've been acquainted with her approximately -- that's a

12  good question.  I'm not sure -- five, six, seven years.  I'm

13  not sure.

14  Q.  Now, you mentioned that economists base their calculations

15  on certain assumptions.  Correct?

16  A.  Yes.

17  Q.  And if the assumptions are wrong, the calculations will be

18  wrong.  Correct?

19  A.  I would assume that, yes.

20  Q.  Credit now, when you testified a few moments ago that you

21  factored into your calculations the wages that Mr. Moran would

22  earn post incident in this case was $53,000 or so?

23          Was that what you said?

24  A.  Yes.

25  Q.  And that number came from where?

1  A.   That was based on taking an average of the range for annual
2  wages suggested by Mr. Joy for base wages.  I started the
3  calculation in 2020 so that that was a figure that reflected
4  earnings growth.
5          I included estimates that I made of what the value
6  would be of various fringe benefits he would get in such
7  employment, if he was employed full time
8  Q.   So the base wages would be how much?
9  A.   The base wage in 2022 would be $39,430.
10 Q.   And what's the remainder?  What brings you up to $53,000?
11 A.   Well, there are $16,357 in health benefits.  There's $2,036
12 in retirement benefits which actually gets one to a higher
13 value than $53,000.  And then the $53,000 then includes
14 subtractions for what he would pay out of those wages to
15 Social Security and Medicare, as well as what he would pay in
16 income taxes.
17 Q.   Now, if I were to tell you to assume that base wages that
18 could have been earned by Mr. Moran were not in the $35,000
19 range but in the $53,000 as Mr. Joy testified in this courtroom
20 yesterday, what does that do to your calculations?
21 A.   Well, I'm not sure what Dr. Joy testified to yesterday
22 because I believe my numbers are consistent with the
23 entry-level wages that were in his report.  However, if $53,000
24 was the base wage that one inserts in my calculation, the
25 damages would be lower.

1  Q.  And the report that you relied on from Mr. Joy is dated
2  when?
3  A.  2019.
4  Q.  I take it that it would be onerous to do the calculations
5  as you sit there on the witness stand as to how much the lost
6  earnings would be reduced.
7  A.  Well, unfortunately, the marshals took away my computer and
8  my phone as I came in here.  So I'm kind of stuck.
9  Q.  Consider yourself lucky, Doctor.
10        This may be obvious.  I'm sure it is obvious.  But you
11  have no opinion as to whether Mr. Moran is entitled to any
12  recovery in this case.  Correct?
13  A.  That would require me to have an opinion on liability by
14  the defendants in this case, and I'm not a liability expert.
15  Q.  If I understood your testimony correctly, you considered
16  the years of past earnings -- 2014, 2015, and 2016 -- on which
17  to calculate Mr. Moran's lost wages.
18  A.  Yes.
19  Q.  Could you have thrown 2013 and 2012 into the mix if you
20  wanted to?
21  A.  Well, I would have needed further information.  I did not
22  have any information from before 2014.
23  Q.  Do you have in front of you what Mr. Moran's W-2 wages were
24  in 2014, 2015, and 2016, the years you considered?
25  A.  What I have would be Medicare earnings, his Medicare